**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Russell SULLIVAN; Mary Ann Sullivan; Eugene Lewis Fisher; Tammy Lawan Sullivan, also known as Tammy Sullivan Fisher; Steve Brown, also known as Steve Morgan; Jimmy Roger Wright, also known as Whiskers, Defendants–Appellants.**

**Nos. 89–7005 and 89–7008 to 89–7012.**

United States Court of Appeals, Tenth Circuit.

Nov. 16, 1990.

Rehearing Denied Feb. 22, 1991.

D.D. Hayes of Bonds, Matthews, Bonds & Hayes, Muskogee, Okl., for defendants-appellants Russell Sullivan, Eugene Fisher and Jimmy Roger Wright.

Peter Goldberger (Alan Ellis, Pamela A. Wilk and James H. Feldman, Jr., Philadelphia, Pa., were with him on the brief), for defendants-appellants Mary Ann Sullivan, Tammy LaWan Sullivan and Steve Brown.

Sheldon J. Sperling, Asst. U.S. Atty. (Roger Hilfiger, U.S. Atty., Muskogee,

Okl., was with him on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, TACHA, Circuit Judge, and VAN BEBBER,* District Judge.

HOLLOWAY, Chief Judge.

### I.

These consolidated appeals are from convictions and sentences following a jury trial of six codefendants for various drug and other offenses. The defendants—members of an extended family, and one friend of the family—were charged in an eight-count indictment as follows:

Count 1 charged a conspiracy among the six defendants between September 1985 and May 1986 to manufacture amphetamine, to possess and distribute amphetamine, and to use firearms in the commission of these offenses, all in violation of 21 U.S.C. § 846. Count 2 charged the six defendants with a separate conspiracy between May 1988 and July 20, 1988, with the same three objectives.

Count 3 charged all defendants but Steve Brown with attempting to manufacture amphetamine on July 20, 1988, in violation of 21 U.S.C. § 846. Count 4 charged all the defendants with using or carrying firearms during the second conspiracy, in violation of 18 U.S.C. § 924(c). Count 5 charged Russell and Mary Sullivan with possessing an unregistered firearm on July 20, 1988, in violation of 26 U.S.C. § 5861(d).

Count 6 charged Russell and Mary Sullivan with cultivating approximately 60 marijuana plants, on July 20, 1988, in violation of 21 U.S.C. § 841(a)(1). Counts 7 and 8 charged Russell Sullivan alone with being a felon in possession of two specified firearms on that date, in violation of 18 U.S.C. § 922(g).

Russell Sullivan, Mary Ann Sullivan, Steve Brown, and Eugene Lewis Fisher were found guilty on all counts with which they had been charged. Tammy LaWan Sullivan Fisher was convicted on Counts 1 and 2 (the conspiracies), but was acquitted on Counts 3 and 4 (attempted manufacture and use of a firearm count). Jimmy Roger Wright was acquitted on Count 1, but was convicted on Counts 2, 3, and 4. The court sentenced the defendants to terms of imprisonment ranging from thirteen to twenty-five years, and imposed $50 special assessments and periods of supervised release.

The defendants present numerous issues on appeal. We address those which are dispositive or are likely to recur. We reverse and remand for a new trial and direct the dismissal of some charges.

### II.

The genesis of this case is a 1988 cooperation agreement among Melvin Ray Rogers, his wife Evelyn, their son Steve Howell, and the government. Melvin Rogers had been convicted four months earlier of four drug related felonies, and agreed to cooperate with the government in return for the government's promise not to prosecute Rogers' wife and son, and to assist Rogers with a Rule 35 motion in connection with his conviction.[1]

Oklahoma Bureau of Narcotics and Dangerous Drugs Agent Fred Means and DEA Agent Doc Shannon extensively interviewed the Rogers family regarding their prior drug activities. During those interviews, the Rogers implicated members of the Sullivan family in six amphetamine "cooks" between September 1985 and May 1986. (A "cook" is loosely defined as the synthesis from various chemicals of a controlled substance, here amphetamine.)[2]

The agents decided to investigate the Sullivan family and, in May or June 1988,

---

* Honorable G. Thomas Van Bebber, United States District Judge for the District of Kansas, sitting by designation.

**1.** We reversed Rogers' conviction and remanded for a new trial. *United States v. Rodgers,* 881 F.2d 844 (10th Cir.1989).

**2.** Where necessary, the factual circumstances of the various cooks are described in the body of the opinion.

sent Evelyn Rogers to the Sullivan home to "see what they were up to." XIII R. at 975. At trial Evelyn Rogers testified that when she arrived at the Sullivan house, she saw boots by the door that smelled like amphetamine. X R. at 322–23. She offered to sell the Sullivans leftover chemicals from their earlier cooks, and, according to Evelyn, Mary and Russell Sullivan instead expressed an interest in using the chemicals to manufacture more amphetamine to make more money. *Id.* at 323. A week or two later, the Sullivans invited Evelyn to return to the Sullivan house for a weekend. Evelyn testified that on that occasion they discussed setting up a drug lab. *Id.* at 326–27. According to Evelyn, Russell and Mary Sullivan said they needed "the whole set up, mantle, jug, condenser ... and 55 pounds of [phenylacetic acid]." The Sullivans "said they had everything else." *Id.* at 329. Evelyn told them she could get the necessary materials.

Mrs. Rogers obtained the needed materials from the case agents and arranged to meet Mary and Russell Sullivan at a motel in Antlers, Oklahoma, to discuss delivery. On July 2, 1988, Evelyn Rogers delivered the glassware furnished by the government agents to the Sullivans' garage. Evelyn testified that she helped Russell and Mary Sullivan hide the glassware behind the Sullivans' home in the weeds and bushes. The following day, Evelyn called Russell Sullivan from a motel in Antlers. She asked if he could meet her at the motel room. Russell agreed, and he and Mary drove to Antlers where they met with Evelyn Rogers and her son, Steve Howell. The conversation between the two codefendants and two informants was recorded.[3] During the conversation the participants discussed previous cooks, certain difficulties they had had with Eugene Fisher, prospects of getting Melvin Rogers out of jail to do a big cook, the events of the previous evening, and a prospective location for the cook they were planning.

Approximately a week later, Russell and Mary Sullivan went to Irving, Texas, to meet with Steve Howell and Evelyn Rogers concerning their efforts to obtain the phenylacetic acid. According to Evelyn, Russell had in his possession a "clip" that "he could drop in his AR–15 in just a matter of seconds." X R. at 375–76. Russell said "it would rock and roll then." *Id.*

On July 18, 1988, Agent Means provided Steve Howell with 55 pounds of phenylacetic acid which Howell then delivered to the Sullivan home. XIII R. at 989. Howell spent that night with the Sullivans at their home. The following morning, Steve Howell and Russell Sullivan weighed the phenylacetic acid in the Sullivans' garage and then, accompanied by Mary Sullivan, went to Steve Brown's house where they examined some "cut" that they planned to use to dilute the product. The three men then loaded Steve Brown's trailer with clothes and groceries, went to pick up the chemicals, and then went to invite Eugene Fisher and Jim Wright to participate. Wright later arrived with five gallons of "a chemical." *Id.* at 545. Meanwhile, Russell Sullivan and Steve Howell went to a nearby Wal–Mart to buy duct tape and electrical plugs, and then returned to the Sullivan house. Sullivan and Howell made one more trip to Steve Brown's house to pick up the glassware and chemicals which they then loaded into Russell Sullivan's truck. Steve Howell, Russell Sullivan, and Steve Brown then drove to Jack Brown's barn, some eight to ten miles from the Sullivans' home, where they then unloaded the truck and began setting up the drug laboratory in the barn.

Howell testified that Eugene Fisher and Jimmy Wright then arrived at the lab site with two five-gallon cans. Howell said that Russell Sullivan and Steve Brown hooked up the electrical panel board in the barn while Fisher and Wright began putting the phenylacetic acid into the jugs that were already set up.

---

**3.** This tape recording was played for the jury, although it is inaudible in several places. The United States Attorney's Office prepared a proffered transcript of the tape recording, which we have reviewed, but which was not admitted in evidence. The trial judge did not determine whether the transcript was accurate.

Eugene Fisher and Jimmy Wright both claimed at trial that they were tricked into coming to the lab site. Fisher testified that on July 19, at dusk, Howell appeared at his home to see if he wanted to go riding around. Howell and Fisher then picked up Jimmy Wright who testified that Howell asked him to assist him in working on a car. Both Fisher and Wright testified that Howell then drove the vehicle to the scene of the lab site where, to their surprise, Howell advised them that he was going to make dope. They testified that Howell supervised and set up the drug laboratory and then asked Fisher and Wright if they would stay and watch the lab while Howell ran an errand. Fisher and Wright testified that they attempted to leave the lab site, but were unable to start the car left there by Howell. They testified that because they were left without transportation, they spent the night in a small trailer near the barn. The following morning, the lab site was raided by several law enforcement agents at which time Russell Sullivan, Eugene Fisher, and Jim Wright were arrested. Steve Brown had left the night before with Steve Howell, and was arrested the following day. Mary Sullivan and Tammy Fisher were arrested at the Sullivan home.

Officers raided the drug lab site and the residences of Russell and Mary Sullivan and Steven Brown pursuant to search warrants obtained from a state court. An additional warrant for a search of the Fishers' residence was secured later that afternoon. Substantial evidence was seized as a result of the searches: controlled substances, including a number of marihuana plants found growing near a pond in the vicinity of the Sullivan home, drug manufacturing equipment, motor vehicles, firearms, and a large number of records, receipts, documents, and other papers said to be related to the drug trafficking enterprise. A pretrial motion to suppress evidence was filed for all defendants. The trial court denied the motion after a hearing. I R., doc. 20, at 6.

The jury trial concluded with the guilty verdicts. These appeals followed from the judgments on the verdicts.

## III.

### Sufficiency of the Indictment
#### A. Count 4

■ The defendants contend that Count 4 of the indictment is defective for failure to allege an essential element of the offense. Count 4 charges that the six defendants "did knowingly and unlawfully use or carry firearms during the commission of a felony ..." in violation of 18 U.S.C. § 924(c)(1).[4] That section makes it a crime to use or carry a firearm "during *and in relation to* any drug trafficking crime...." 18 U.S.C. § 924(c)(1) (1988) (emphasis added). Defendants argue that Count 4 is fatally defective for failing to charge that the firearms in question were used or carried "in relation to," and not merely "during," the charged drug conspiracy.[5]

The recent decision of another panel of this court in *United States v. Bullock*, 914 F.2d 1413 (10 Cir.1990), obliges us to uphold Count 4 of the indictment in the instant case against the argument of the

---

**4.** Count 4 charged as follows:

COUNT 4
(18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2)

From on or about May 1, 1988, through on or about July 20, 1988, in the Eastern District of Oklahoma, RUSSELL SULLIVAN, EUGENE FISHER, JIMMY ROGER WRIGHT, MARY ANN SULLIVAN, TAMMY SULLIVAN FISHER, and STEVE MORGAN BROWN did knowingly and unlawfully use or carry firearms during the commission of a felony which may be prosecuted in a court of the United States, to-wit: conspiracy to manufacture amphetamine, a Schedule II stimulant controlled substance, contrary to the provi-

sions of Title 21, United States Code, Section 846.

All in violation of Title 18, United States Code, Section 924(c)(1) and Title 18, United States Code, Section 2.

**5.** Defendants concede that they did not raise this issue before or during trial. Appellants' Brief at 31. However, the legal sufficiency of an indictment may be challenged at any time, but where the objection is not raised before or during trial the challenged language will "be construed liberally in favor of validity." *United States v. Freeman*, 813 F.2d 303, 304 (10th Cir. 1987).

defendants here. In *Bullock*, there was a challenge to Count 9 of that indictment. That Count 9 charged a violation of 18 U.S.C. §§ 2 and 924(c) for knowingly using or carrying firearms unlawfully "during the commission of a drug trafficking [crime]." (at 1414). The *Bullock* panel held that as to Count 9 and another count challenged in that indictment for the first time on appeal, the indictment was adequate. (at 1417).

Here, Count 4 of the indictment alleged that the defendants "did knowingly and unlawfully use or carry firearms during the commission of a felony ... to-wit: conspiracy to manufacture amphetamine...." See note 4, *supra.* We see no reasonable basis for distinguishing the wording of the charge in this Count 4 from the language of Count 9 in the *Bullock* indictment, which the panel there upheld. Accordingly, we must uphold Count 4 of the instant indictment.

### B. *Count 5*

■ Russell and Mary Sullivan further argue that Count 5 must be dismissed because that charge is imprecise and ambiguous. Count 5 charged that "Russell Sullivan and Mary Ann Sullivan knowingly possessed a firearm, that is, an AR–15 Rifle, bearing serial number SP207875 with a drop-in auto sear, which had not been registered to them in the National Firearms Registration and Transfer Record," in violation of 26 U.S.C. § 5861(d).[6]

The term "firearm" is not used in its conventional sense; instead it is specifically defined for purposes of the National Firearms Act in eight subsections of 26 U.S.C. § 5845(a). The specific weapons listed in the eight subparagraphs of subsection (a) are further defined in greater detail in subsections (b)-(f) of § 5845. The defendants argue that the several definitions of the term "firearm" in § 5845(a)-(e) are distinct and mutually exclusive. They therefore say that it is impossible to tell from the

indictment whether the grand jury charged that the "AR–15 Rifle ... with a drop-in auto sear" was a "rifle" as defined in § 5845(c), a "machine gun" as defined in § 5845(b), or "other weapon" as defined in § 5845(e).[7] We do not agree.

■ Count 5 clearly alleges every element of the offense charged. The only question is whether it does so with the requisite clarity. An indictment that merely tracks the language of the relevant statute is valid only if the statute "fully, directly, and expressly, without any uncertainty or ambiguity, sets forth all the elements necessary to constitute the offense...." *Russell v. United States*, 369 U.S. 749, 765, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962) (*quoting United States v. Carll*, 105 U.S. 611, 612, 26 L.Ed. 1135 (1881)). Where the statutory definition of an offense employs generic terms, it is not sufficient to charge the offense in the same terms employed by the statute; the indictment must "descend to particulars." *Russell*, 369 U.S. at 765, 82 S.Ct. at 1047 (*quoting United States v. Cruikshank*, 92 U.S. 542, 558, 23 L.Ed. 588 (1875)).

In *Robbins v. United States*, 476 F.2d 26 (10th Cir.1973), we held that an indictment which alleged that the defendant did "knowingly possess a firearm, that is, a destructive device being more particularly described as one homemade incendiary bomb, which had not been registered to him in the National Firearms Registration and Transfer Record" sufficiently alleged the essential facts constituting an offense under the statute and need not be accompanied by citation to the section of the statute which defines the term "firearm." 476 F.2d at 30. We held that the indictment was not vague or indefinite. *Id.* at 31.

■ Here the indictment specifically identified the "firearm" by serial number and as an AR–15 Rifle with a drop-in auto sear. We think that is sufficient. Although it might have been preferable to

---

**6.** That section provides in relevant part:
It shall be unlawful for any person—
(d) To ... possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record....

26 U.S.C. § 5861(d).

**7.** Defendants concede that subsection 5845(d), defining "shotgun," has no arguable application to the facts of this case.

allege that the AR–15 was a "machine gun" within the meaning of 26 U.S.C. § 5845(b),[8] and not a "rifle" (§ 5845(c)), we do not think the failure to specify which statutory definition applied to the AR–15 Rifle impermissibly hindered the defendants' ability to prepare their defense or deprived them of their Fifth Amendment right to trial on charges made by a grand jury. We hold that Count 5 sufficiently charged a violation of 26 U.S.C. § 5861(d).

## IV.

### Improper Use of 404(b) Evidence

All of the defendants argue that they were denied a fair trial because the prosecutor repeatedly elicited evidence of uncharged crimes, wrongs or other acts in contravention of Federal Rules of Evidence 403 and 404.[9] They make three related arguments: first, that the trial court abused its discretion when it admitted such evidence; second, that the defendants were unfairly prejudiced by the prosecutor's improper use of such evidence after the trial court sustained defendants' objections, and the judge's failure to strike it or instruct the jury to disregard it; and third, that the prosecutor's repeated attempts to use the evidence in disregard of the court's admonitions constitute prosecutorial misconduct.

**8.** At trial, the government's expert witness testified that the modified AR–15 was a machine gun capable of fully automatic fire with or without the auto sear. XIII R. at 956–57. There is no doubt, therefore, that the AR–15 in question is a "machine gun" within the meaning of 26 U.S.C. § 5845(b).

**9.** Federal Rule of Evidence 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion or the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 Federal Rule of Evidence 404 provides in relevant part:
 (a) **Character evidence generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion,....

### A. The Disputed Evidence

Prior to trial, the district court warned the prosecutor about the use of evidence of other wrongs. IX R. at 60–62. Specifically, the court warned the prosecutor that evidence about "the propensity of some of the defendants to carry pistols and automatic weapons" was evidence of other crimes, and as such was "not relevant unless you can get around it some way...." *Id.* at 60. The court instructed the prosecutor to "talk with your witnesses about that, and about all other 404(b) material they might be prone to testify about." *Id.* at 60–61. Following a noon recess, the court again warned the prosecutor about the use of Rule 404(b) evidence. *Id.* at 64.[10]

The prosecution sought to introduce testimony regarding three events: (1) Eugene Fisher's alleged participation in an amphetamine cook in Mississippi; (2) the investigating agents' fear that Jim Wright might be guarding the lab site with a "sniper rifle," and the corresponding fact that the arresting officers were heavily armed when they raided the lab; and (3) Russell Sullivan's alleged possession of a firearm and holster in Irving, Texas. In each case, testimony concerning these events reached

\* \* \* \* \* \*

 (b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**10.** The court gave the following admonition:
 And I also want to remind government to comply with United States of America v. Louis Anthony Rivera, which comes out of this court, and it is law, because of the case that emanated, of course, from this court and places a heavy duty, a heavy responsibility on the government in the event there is any 404 material....
 IX R. at 64.

the jury either because the trial court admitted the testimony over the defendants' objection or, as was more often the case, because the prosecutor elicited improper references to those events despite sustained objections to the testimony and in disregard of the district court's repeated admonitions to avoid such testimony. In every such instance, the defendants unsuccessfully moved for a mistrial.

### 1. The Mississippi Incident

The first reference to the alleged Mississippi incident was elicited by the prosecutor about half way through the direct examination of the prosecution's third witness, informant Steve Howell. He was recounting a late night conversation he had with Russell and Mary Sullivan when the prosecutor asked whether Fisher's Aunt Millie was present during the course of the conversation. Defense counsel objected on the ground of relevance, which objection was sustained. IX R. at 528–29. However, the prosecutor persisted:

Q. Well, did anyone else participate in the conversation, actually say things other than you and Russ and Mary?
A. No.
Q. Did you talk at all with Millie?
A. Yes.
Q. And what did you talk with Millie about?

11. The transcript reads in relevant part:

THE COURT: Well, I'll tell you this, you have made this argument, and I am going to let you put it in. But I'll tell you what I think. You're so concerned about your position that I think the Circuit Court of Appeals ought to consider this, and if they believe that it is not relevant and something you're just putting in here for no good reason when it's not necessary, I think they ought to dismiss the case as against all the defendants. So I'm going to let you go ahead. But that's my opinion. So you just go ahead with it.

MR. SPERLING: In view of your opinion, Your Honor, I am going to withdraw the question.

THE COURT: *It's too late now, you can't take it out of these people's minds, so you go ahead.*

MR. SPERLING: I know I can't, but if they feel strongly enough about this to wish the court to admonish the jury to disregard it I do not object to that.

*Id.* at 529. Defense counsel again objected, and the court again questioned the relevancy of the testimony. This time, however, the court overruled defense counsel's objection on the prosecutor's representation that Millie was an unindicted and unnamed co-conspirator. *Id.* at 529–30. The prosecutor then asked Mr. Howell what he spoke with Millie about. Howell answered, *"we talked about when Eugene went to Mississippi to cook."* *Id.* at 530 (emphasis added). Defense counsel immediately moved for a mistrial.

The court expressed amazement at the prosecutor's effort to inject such evidence into the case. *Id.* at 531–532. The court twice noted that the evidence was unnecessary to the government's case, and again asked the prosecutor why he thought it was relevant. The prosecutor answered, "because I think it's part of the history of the conspiracy." *Id.* at 533. The judge ultimately ruled in favor of admissibility, but expressed grave doubts as to the relevancy of the testimony and refused to give a cautionary instruction because the judge believed the damage had been done.[11] The court did not expressly rule on defense counsel's motion for a mistrial.

Near the end of the trial, the prosecutor returned again to the alleged Mississippi cook and referred to amounts of ammunition present there.[12] Defense counsel ob-

THE COURT: I'm not going to cure it for you.
. . . .
And I want the record to be clear. If we went back in these cases time after time after time after time, you have done the same thing. And that's the reason that I think it's not relevant and it ought to be dismissed. Rec. vol. XI, at 533–34 (emphasis added).

12. During the government's cross-examination of Eugene Fisher, the following exchange occurred:

Q. All right. Incidentally, did Millie own or live in a house in Idabel, in the Idabel area?
A. Yes.
Q. All right. What happened to that house?
A. It burnt.
Q. It burned? How many times did you cook in that house?
A. Never.
Q. Well, you were in Mississippi, too; weren't you?
A. No.

jected. The court sustained the objection, but declined to hear defense counsel's motion for a mistrial until the jury was excused for the day. *Id.* at 1846. Later, counsel moved for a mistrial on the ground that the prosecutor had again referred to the Mississippi incident, in violation of the court's previous order. *Id.* at 1895–96. The prosecutor again argued that the Mississippi incident was part of the history of the conspiracy and that defense counsel had opened the door by asking the defendant if he knew anything about drugs, or if he knew how to manufacture them. *Id.* at 1896. The court rejected the prosecution arguments and again admonished the prosecutor to stay away from the events that allegedly occurred in Mississippi. XVI R. at 1897–98.

Despite the admonitions, the prosecutor again referred to the alleged Mississippi cook during his closing argument. XVII R. at 2178.[13] Defense counsel again unsuccessfully moved for a mistrial after the prosecutor's closing argument. *Id.* at 2246–47.

### 2. The Sniper Testimony

Another category of allegedly improper testimony concerns two witnesses' references to the possibility that Jim Wright might be acting as a sniper in the vicinity of the lab site, and related testimony that the arresting officers were heavily armed when they made the lab site arrests. The defendants argue, and the district court

Q. You have never been in Mississippi?
A. To my knowledge I ain't.
Q. Isn't it a fact that you went to Mississippi with some thousand round of ammunition and shot them all up?
A. No.
Q. Millie owns a house in Mississippi; doesn't she?
A. She used to live in Mississippi.
XVI R. at 1845–46.

13. Purportedly referring to the contents of a tape-recorded conversation, the prosecutor argued to the jury as follows:

And then in a lengthy monologue the use of Millie's place for a cook, a fire there, is interesting building a safe cooking house. He [referring to Russell Sullivan] says, 'That's one time we should have shot Dennis [Smith] because, boy, he ripped us off that night.

apparently agreed, that the prosecution's repeated references to fear of a sniper, despite sustained objections and admonitions from the court, unfairly prejudiced the defendants.

The subject first came up during the prosecutor's direct examination of Officer Duncan, one of the arresting officers. Duncan testified that "I planned to go into the situation with a full force raid team ... [because] one of the suspects, Mr. Wright, was supposed to be in the woods with a sniper rifle." XI R. at 710. Defense counsel immediately objected on the basis of hearsay. *Id.* The court sustained the objection and, during a bench conference, observed that the evidence was both unnecessary and could not have been offered *"for any other reason than to try to prejudice the defendants,"* stating the evidence was *"just more prejudicial than probative."* *Id.* at 710–11 (emphasis added).[14] Defense counsel's motion for a mistrial, however, was denied. *Id.* at 713.

After the bench conference, the prosecutor requested permission to confer with Officer Duncan, presumably to advise him of the court's ruling and admonition. However, during cross-examination Duncan again stated that, "We had been told that Jimmy Wright was the sniper in this deal, that he was supposed to be out in the woods and he would cover from the woods periodically." Tr. XII at 863–64. The answer was admittedly unresponsive, and counsel requested an appropriate admon-

14. The prosecutor argued that the evidence was relevant "as to the dangerousness [of] the lab." *Id.* at 711. The district court strenuously disagreed. *See id.* at 711–12. The court ruled as follows:

No. If you can't give me any better reason than that, I'll sustain the objection, and stay out of how dangerous the lab was, the area, stay out of that area. Just don't mess with it. There is no need to go into it. If you can't give me any better reason than you have so far, *it's just more prejudicial than probative. And that's true of how many agents went in unless there is some reason any particular agent did anything. It's just not necessary. It doesn't prove any element of any crime that you can show me.*
*Id.* at 712 (emphasis added).

ishment from the court. The judge cautioned the witness to merely answer the questions, but did not strike the testimony or admonish the jury to disregard it. *Id.* at 864.

The subject arose again during the prosecution's direct examination of Agent Means. The prosecutor had returned to the subject of the raid on the drug lab and Agent Means said that because he was "fearful that a sniper may be concealed in the woods," he sent four or five men into the woods 30 to 40 minutes before his main assault team went in. *Id.* The court sustained defense counsel's timely objection on the ground that the testimony was cumulative. *Id.* at 102–03.

### 3. The Irving, Texas Incident

A further claim of the prosecutor's improper use of evidence concerns testimony that Russell Sullivan was in possession of a gun and holster in Irving, Texas, an act not alleged in the indictment. The first reference to the incident occurred on the first day of trial, during the direct examination of Evelyn Rogers. She testified that during a visit by the Sullivans to her home in Irving, Texas, Russell Sullivan had carried a firearm. X R. at 367–68. The court sustained defense counsel's objection on the ground of relevance. *Id.* at 371. Shortly thereafter, the prosecutor showed Mrs. Rogers a holster that had been marked for identification, but not yet admitted into evidence. *Id.* at 382. While laying a foundation for the holster's admission, the prosecutor asked Mrs. Rogers where she had seen it before. Mrs. Rogers responded that she had seen the holster in Russell Sullivan's possession at Irving, Texas. *Id.* at 382–83. Defense counsel requested that her testimony be stricken and that the jury be admonished to disregard it. *Id.* The prosecutor acknowledged that counsel's request should be granted in view of the court's earlier ruling. *Id.* at 384. The court sustained the objection, but denied defense counsel's request for a mistrial. Instead, the court ordered the testimony stricken from the record and cautioned the jury to disregard it. *Id.* at 387.

The last reference to Russell Sullivan's possession of a gun in Irving, Texas, occurred during the government's direct examination of informant Steve Howell. The witness identified a photograph of a .38 caliber revolver which he said was in Russell Sullivan's possession in Irving. XI R. at 581. After a bench conference, the court admitted the evidence over the objection of defense counsel on the prosecutor's representation that the witness would eventually place the gun at the lab site. *Id.* at 584.[15]

Russell Sullivan argues that the prosecutor's repeated efforts to elicit testimony concerning his possession of a gun in Irving, Texas, constituted prosecutorial misconduct which deprived him of a fair trial. The premise of his argument is that the evidence was inadmissible because it concerned an event not charged in the indictment and which did not occur in the Eastern District of Oklahoma. Sullivan argues that the prosecutor's repeated efforts to elicit such testimony was improper in light of the trial court's admonition to the prosecutor not to bring up evidence of other crimes, including testimony about the propensity of some of the defendants to carry firearms. *See* IX R. at 60.

At trial, the prosecutor argued that the evidence was admissible because it tended to prove an essential element of the offense charged in Count 4 of the indictment, namely possession of a firearm during and in relation to the 1988 conspiracy. In its brief, however, the government simply asserts that the evidence is admissible under Rules 403 and 404 "for all the same rea-

---

**15.** Defense counsel objected on two grounds. First, he relied on the grounds of relevancy and undue prejudice along the lines of his earlier objections to testimony about this incident. Second, he said that Russell Sullivan was charged with carrying a nine millimeter pistol and with carrying an AR–15 machine gun, but was not charged in the indictment with carrying this .38 caliber revolver. *See* XI R. at 582–83. The court questioned the relevance of the witness' testimony that he saw the gun in Irving, Texas, but overruled defense counsel's objections on both grounds. *See id* at 584.

sons [as] the Mississippi incident," and that "none of the defendants has shown prejudice which could negate a finding of harmless error." Appellee's Joint Brief at 67.

## B. *Analysis*

Defendants argue that the prejudicial references to the unrelated wrongs or acts were inadmissible under Rules 403 and 404 of the Federal Rules of Evidence and that the district court abused its discretion to the extent that it admitted such evidence; that to the extent the court sustained objections to the evidence and admonished the prosecutor not to use such evidence, the prosecutor's repeated use of the prohibited evidence despite the court's warnings deprived the defendants of a fair trial. We must agree, except with respect to the government's inquiries regarding the Irving, Texas incident, which we believe were permissible and are discussed later. *See infra* at 1417.

Rule 404(b) "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity or knowledge." *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988); *see also United States v. Doran*, 882 F.2d 1511, 1523 (10th Cir.1989). Because "[e]vidence of prior criminal acts is almost always prejudicial to the defendant," *United States v. Shepherd*, 739 F.2d 510, 513 (10th Cir. 1984), the use of such evidence must be carefully circumscribed to protect the defendant from unfair prejudice. In *Huddleston* the Court stated:

the protection against such unfair prejudice emanates not from a requirement of a preliminary [Rule 104(a)] finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402 ...; third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair

prejudice ...; and fourth, from [Rule] 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Id.* 485 U.S. at 691, 108 S.Ct. at 1502 (citations omitted).

 The improper interjection of prejudicial evidence concerning the "Mississippi cook" and sniper testimony compels us to remand for a new trial. The testimony referring to a "Mississippi cook" was clearly remote and not offered for a proper purpose. After the trial judge sustained two objections to the prosecution's effort to elicit Howell's testimony about the Mississippi incident, the prosecutor replied that the evidence was relevant because "it's part of the history of the conspiracy." XI R. at 533. Such a general assertion as a basis for introducing evidence of prior wrongs or conduct is not sufficient for purposes of Rules 403 or 404(b). *See United States v. Doran*, 882 F.2d at 1523. In some conspiracy cases we have upheld the admission of evidence to establish identity, intent, motive, or plan as relevant and proper. *See, e.g., United States v. Mora*, 845 F.2d 233, 237 (10th Cir.) *cert. denied*, 488 U.S. 995, 109 S.Ct. 562, 102 L.Ed.2d 587 (1988); *United States v. Davis*, 780 F.2d 838, 847 (10th Cir.1985). When specifically relevant in such circumstances, particular history of a conspiracy may be probative. Here, however, the prosecutor made no effort to explain a probative purpose or connection of the earlier conduct in Mississippi to this case. At various points, the trial judge found that the evidence was unnecessary, irrelevant and prejudicial.

 We likewise are convinced that the evidence concerning the supposition of a sniper being in the area of the lab site was inadmissible and prejudicial. The testimony elicited from Officer Duncan referred to using an armed team because defendant Wright was supposed to be in the woods with a sniper rifle. XI R. at 710. Although the court sustained objections to questions about the sniper, the trial court

did not strike the testimony or admonish the jury to disregard it, XII R. at 864, and denied a motion for a mistrial.

We are convinced that the repeated interjection of such prejudicial evidence violated Rule 404(a). The evidence of other wrongs did not tend to establish a consequential fact at issue, and instead tended to prove only criminal disposition. The rule clearly prohibits the introduction of evidence of a person's character or trait merely to prove action in conformity with such character. *United States v. Temple*, 862 F.2d 821, 824 (10th Cir.1988). The "Mississippi cook" evidence was of this type and it was emphasized to the prejudice of the defendants. *Id.* at 824; *see also United States v. Hogue*, 827 F.2d 660, 663 (10th Cir.1987); *United States v. Shomo*, 786 F.2d 981, 986 (10th Cir.1986); *United States v. Shepherd*, 739 F.2d 510, 512–13 (10th Cir.1984).

 Likewise, we are persuaded that there was a violation of Rule 403, which calls for a weighing of the danger of unfair prejudice against the probative value of the evidence. Indeed, the trial judge made strong statements that the sniper evidence was more prejudicial than probative and could not have been introduced for any other reason "than to try to prejudice the defendants." XI R. at 710–11. The judge made a similar statement concerning the "Mississippi cook" evidence and clearly announced his view that it was not relevant. *E.g.* at 534. Moreover, the court declined to give a cautionary instruction despite the prosecutor's offer to withdraw the question, because "you can't take it out of these people's minds...." *Id.* We are convinced that any probative value of "such precarious evidence is substantially outweighed by the danger of unfair prejudice" and therefore the evidence should have been excluded under Rule 403. *United States v. Temple*, 862 F.2d at 824; *United States v. McManaman*, 606 F.2d 919, 925–

926 (10th Cir.1979); *United States v. Biswell*, 700 F.2d 1310, 1319 (10th Cir.1983).

 However, with respect to the evidence concerning Russell Sullivan's possession of a gun and holster in Irving, Texas, we find no reversible error. We agree with the government's contention at trial that the evidence was probative of charges made in the indictment concerning firearms. The trial judge has broad discretion to determine whether such evidence is relevant, and whether the probative value is outweighed by the danger of unfair prejudice. We do not believe the judge abused his discretion in his rulings concerning this evidence.

We are convinced that the violations of the rules with respect to the "Mississippi cook" evidence and that concerning the sniper matter were clearly prejudicial, requiring remand for a new trial.

## V.

### Jury Instructions

#### A. Entrapment Instruction

All of the defendants except Russell Sullivan and Tammy Fisher argue that the district court erred in refusing to give an entrapment instruction as to Counts 2 through 5.[16] The defendants requested an entrapment instruction prior to the close of the evidence, and again after the closing arguments. *See* XVII R. at 2153.[17] The district judge did not articulate his reason for refusing to give the requested instruction, but he had earlier expressed the view that the defendants were not entitled to an entrapment instruction unless they admitted all the essential elements of the crimes charged. *See* XI R. at 745–46.

Although that was formerly the law in the Tenth Circuit, *see, e.g., United States v. Mabry*, 809 F.2d 671, 688 (10th Cir.), *cert. denied*, 484 U.S. 874, 108 S.Ct. 33, 98 L.Ed.2d 164 (1987), the Supreme Court has

---

16. The district court instructed the jury on the law of entrapment with respect to Russell Sullivan as to Counts 2 and 3 of the indictment. Russell Sullivan does not argue on appeal that he was entitled to an entrapment instruction with respect to any other counts.

17. Defense counsel's request omitted naming defendant Steve Brown, but the omission appears to have been an oversight.

clearly held to the contrary in *Mathews v. United States*, 485 U.S. 58, 62, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). In *Mathews* the Court held that a defendant is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment even if the defendant denies one or more elements of the crime. 485 U.S. at 62, 108 S.Ct. at 886. The only issue before us, therefore, is whether the evidence warranted such an instruction. Although we must reverse on grounds already discussed, we consider the issue because of its likely significance on retrial.

■■■ The defense of entrapment has two elements: "First, government agents must have induced the defendant to commit the offense; and, second, the defendant must not have been otherwise predisposed to commit the offense, given the opportunity." *United States v. Fadel*, 844 F.2d 1425, 1429 (10th Cir.1988); *Mathews*, 485 U.S. at 63, 108 S.Ct. at 887. Inducement is "government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir.1986). "[It] may take the form of 'persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship.'" *Id.* (quoting *United States v. Burkley*, 591 F.2d 903, 913 & n. 18 (D.C.Cir.1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979)). Predisposition is the "defendant's inclination to engage in the illegal activity for which he has been charged," *Ortiz*, 804 F.2d at 1165, and "may be inferred from a defendant's histo-

ry of involvement in the type of criminal activity for which he has been charged, combined with his ready response to the inducement offer." *Id.* The defendants must point to evidence of both inducement and lack of predisposition to establish a genuine issue concerning the origin of criminal intent. *Id.*[18] Although we have variously described the degree of proof required to submit an entrapment defense to a jury, "the test is whether the evidence, regardless of amount, creates a factual issue." *Fadel*, 844 F.2d at 1430. If the evidence on the question of entrapment is conflicting, therefore, the question should be submitted to the jury.

■■■■■ We believe the evidentiary record in this case warranted a jury instruction on entrapment with respect to Counts 2, 3 and 4.[19] These four defendants argue that they have no prior felony convictions and that the prosecution failed to demonstrate that any one of them was predisposed to commit the crimes charged. All of the defendants testified and they each denied any prior involvement in the manufacture of amphetamines or any related illegal drug trafficking activity. Although there was evidence from which a jury might conclude otherwise and infer predisposition, this point was a factual dispute.[20]

Furthermore, all of the defendants testified that they were induced in one way or another by the government informants to participate in the 1988 drug manufacturing effort. The defendants were first approached by Evelyn Rogers at the direction of Agent Means. Mary Sullivan testified

**18.** Once the defense is raised, however, and the defendants have shown that the evidence amounts to a triable issue, then the burden shifts to the government to prove predisposition beyond a reasonable doubt. *Ortiz*, 804 F.2d at 1165 (citing *United States v. Smegal*, 772 F.2d 659, 660 (10th Cir.1985)); *see also United States v. Gurule*, 522 F.2d 20, 25 (10th Cir.1975) *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976); *Martinez v. United States*, 373 F.2d 810, 812 (10th Cir.1967).

**19.** Only Russell and Mary Sullivan were charged in Count 5 (possession of an unregis-

tered firearm) and neither defendant points to any evidence of entrapment with respect to that count.

**20.** In particular, the government informants testified that the defendants had been actively involved in the manufacture of amphetamine in 1985–86. The defendants, of course, denied any participation in those alleged "cooks." Furthermore, there is no evidence in the record suggesting that they were involved in like criminal activity during the intervening two years. The evidence of predisposition was thus in conflict.

that Mrs. Rogers repeatedly entreated her to assist in the venture to help alleviate Mrs. Rogers' supposedly desperate situation. XVII R. at 2062–65, 2067, 2069–70.[21] She further testified that she only reluctantly agreed to go to the Antlers motel and participate in the discussion there with her husband, Mrs. Rogers and Steve Howell. *Id.* at 1076–77. Jimmy Wright and Eugene Fisher both testified that they were tricked into going to the lab site.[22] Finally, it is undisputed that the government provided the defendants with most of the necessary glassware for the drug lab, and 55 pounds of phenolacetic acid. "Of course evidence that government agents merely afforded an opportunity or facilities for the commission of the crime would be insufficient to warrant [an entrapment] instruction." *Mathews*, 485 U.S. at 66, 108 S.Ct. at 888. Nevertheless the evidence here was relevant and tended to support the defendant's version of the facts.

We are persuaded that there was sufficient evidence to go to the jury on entrapment and that the instruction should have been given on Counts 2, 3 and 4 for defendants Mary Sullivan, Eugene Fisher, Jimmy Wright and Steve Brown, as well as for Russell Sullivan for whom an entrapment instruction was given. On retrial, if a similar record is made, we feel the charge should be given.[23]

### B. Defendants' Claim of Error Due to Lack of "Balanced" Credibility Instruction

Defendants argue that the instructions of the trial judge improperly pointed to defendants and their interest in the result of the trial, that there was no proper balancing instruction by informing the jury of the defendants' "equal competence as witnesses," and that under decisions, such as *United States v. Matias*, 836 F.2d 744, 749–50 (2d Cir.1988), *inter alia*, the prejudicial charge requires reversal. *See, e.g.,* Appellants' Joint Brief at 42–44.

We do not agree. The instructions given by the trial judge in no way amounted to an undue emphasis on the "deep personal interest which every defendant has in the result of his case" and other portions of the charge stressed in *Matias*, 836 F.2d at 749–50. We have examined the entire charge given here and are not persuaded by the defendants' arguments. The judge properly cautioned the jury as to the testimony of informants with a self-interest being considered with caution and weighed with great care, and he likewise properly instructed that accomplice testimony is to be received with caution and weighed with great care. Tr. 2232–33. And the judge gave the customary instruction that the jurors were the judges of the facts, the weight of the evidence, and credibility of the witnesses, and that they might consider

---

**21.** Mrs. Rogers spoke of her husband in jail, her tremendous need for money, and her inclination toward suicide. XVII R. at 2062–65. According to Mary Sullivan, Mrs. Rogers asked Mary and Russell to help persuade her son, Steve Howell, to help Evelyn set up an amphetamine "cook" in order to make money. *Id.*

**22.** They each testified that on the night the lab was set up, Steve Howell appeared at each of their homes and asked them to accompany him to work on a car, XVI R. at 1855, or simply to go for a ride and do some shooting. *Id.* at 1796. They testified that, pursuant to that request, they left with Howell and drove to the nearby farm owned by Jack Brown, a mechanic. *Id.* at 1857.

According to both defendants, Howell first informed them that "he was going to make dope" *after* they had arrived at the lab site. *Id.* at 1800, 1859. Fisher testified that Howell then unboxed the lab equipment and assembled it.

*Id.* at 1801–02. Both defendants testified that Howell asked them to stay and watch the operation while Howell was temporarily gone from the scene. *Id.* at 1801, 1878.

Wright testified that he reluctantly stayed at the lab site, *id.* at 1881–82; that later he and Eugene Fisher attempted to leave, but were unable to start the car left at the scene by Howell. *Id.* at 1833. Fisher also testified that he and the co-defendants attempted to leave, but were unable to start the car left by Howell. *Id.* at 1807.

**23.** We note that in the entrapment instruction given as to Russell Sullivan, the charge stated in part that "[o]ne raising the defense of entrapment does not deny the commission of the acts involved, but he should not be convicted if he is entrapped." The language saying the one raising the entrapment defense does not deny commission of the acts should not be used, so as to avoid conflict with *Mathews*, 485 U.S. at 62, 65–66, 108 S.Ct. at 886, 887–88.

the interest, if any, which a witness may have in the result of the trial, *inter alia.* Tr. at 2235.

We have considered the defendants' several related complaints concerning the instructions and believe they are without merit except, as noted, with respect to submitting an entrapment instruction.

## VI.

### Other Evidentiary Rulings

#### A. Evidence of Multiple Firearms

 Defendants contend that the trial court erred when it admitted in evidence a .22 caliber rifle seized from a trailer approximately 100 yards from the lab site and photographs of approximately 20 weapons seized from the Sullivan and Fisher residences.[24] They say the firearms were not relevant since there was no credible evidence linking the firearms to any of the crimes charged. Defendants also argue that to the extent the evidence was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. The prosecution contends that the firearms, or photographs of them, were admissible as evidence of the crimes charged under a "tools of the trade" theory,[25] and that any error as to the admissibility of the firearms was harmless since there was other substantial and direct evidence to support the defendants' convictions.

 As a general rule, evidence that the defendants possessed weapons or other paraphernalia that may have been used in committing the crimes for which they are charged is relevant. *See* 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 401[10],

at 401–70 & n. 14 (a collection of cases). In *United States v. Romero*, 692 F.2d 699 (10th Cir.1982), we upheld the admission of two revolvers seized from a van in which the defendants were transporting marijuana because "[t]he firearms may have been part of the circumstantial evidence of an intent to distribute the marijuana." 692 F.2d at 705. Although the instant case is not on all fours with *Romero*,[26] that court's reasoning is applicable here. In this prosecution for conspiracy to manufacture amphetamine, and attempted manufacture of amphetamine, the firearms seized from the Sullivan and Fisher homes were introduced for a proper probative purpose. We hold that the trial court did not abuse its discretion in permitting the introduction of the photographs of various weapons in evidence at trial.

Several courts have held that firearms are generally admissible in a drug conspiracy trial because they are "tools of the trade" for those engaged in illegal drug activity. *See, e.g., United States v. Crespo de Llano*, 838 F.2d 1006, 1018 (9th Cir. 1987); *United States v. Cresta*, 825 F.2d 538, 554 (1st Cir.1987), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *United States v. Martinez*, 808 F.2d 1050 (5th Cir.), *cert. denied*, 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987); *United States v. Rodriguez*, 765 F.2d 1546 (11th Cir.1985). Without accepting this broad proposition as a substitute for a more detailed case-by-case analysis under Federal Rules of Evidence 401 and 403, we are persuaded that there was sufficient independent evidence to tie the weapons found at the Sullivan and Fisher residences to the crimes charged so that their admission in evidence was not error.

---

**24.** Defendants did not object to the admissibility of the three handguns seized at the lab site.

**25.** In its brief, the prosecution argues that because Russell Sullivan was charged with being a felon in possession of a firearm, all of the firearms found at his residence are admissible under Rule 404(b) to show his criminal intent to engage in the crimes charged, and as proof of his knowledge, motive, or absence of mistake or accident. In that connection, the prosecution argues that because the remaining defendants did not request a limiting instruction from the

trial court, any error with regard to the admissibility of the firearms as to them is not reversible. *See* Gov't Br. at 70. Because we conclude on other grounds that the trial court did not abuse its discretion in admitting the evidence, we need not address this argument.

**26.** In particular, the firearms here were seized from the defendants' homes some eight or ten miles from the lab site. Further, unlike *Romero*, the defendants here objected to the prosecution's use of the firearms at trial.

Furthermore, although the large number of weapons involved here creates some risk of undue prejudice, we are persuaded that any undue prejudice was outweighed by the probative value of the evidence. Before the weapons were admitted, several witnesses testified that the defendants routinely carried firearms, both for legal and illegal purposes. Moreover, the defendants testified that it was their general practice to possess and carry firearms for recreational purposes and that most of the persons in the community possessed guns. *E.g.*, XIV R. at 1332, 1338; XV R. at 1558. Finally, the government did not attempt to parade the weapons before the jury; instead, it relied on photographs of the weapons found at the Sullivan and Fisher residences. This use of the evidence was proper.

In sum, we feel there was ample evidence in this case from which a jury could infer that the defendants' access to firearms not only facilitated their drug manufacturing efforts, but also provided the type of protection the defendants believed they needed for their operation. Admission of the evidence was not error.

## B. *Exclusion of Evidence of Russell Sullivan's Mental Condition*

Defendants argue that the trial judge erred in excluding expert testimony concerning Russell Sullivan's mental condition. Defendants' attorney offered proof that Dr. Bohn from the Springfield, Missouri, Medical Facility would testify that Sullivan would have the resistance of a five to nine-year-old, and that this, coupled with the rest of his physical and mental condition, would make him extremely susceptible to being persuaded to commit an illegal act to commit an illegal act. XV R. at 1467–68. The trial judge excluded the testimony, ruling that timely notice pursuant to Rule 12.2(b), Fed.R.Crim.P., had not been given. The judge further denied a motion for leave to file the notice at the time of trial. XI R. at 744–45; XV R. at 1589–90 ("I am going to tell you that my ruling still stands as to anything under 12.2.").

Because we reverse and remand for a new trial for reasons stated elsewhere, we express no opinion on the defendants' argument that the trial judge abused his discretion in so ruling. This issue is likely to arise again on retrial, given the strenuous arguments on appeal that the evidence should be admitted on the entrapment defense. However, because the circumstances at the time of the retrial will be considerably different from those which were before the judge at the earlier trial, we decline to express any view as to the ruling that should be made at a subsequent trial.

We do feel it proper to address one question because it too is likely to be presented again. We must decide whether Rule 12.-2(b), concerning "expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of his guilt," applies to testimony going to the defendant's susceptibility to entrapment. In *United States v. Hill*, 655 F.2d 512, 518 (3d Cir.1981), the Third Circuit held that Rule 12.2(b) does not apply in such circumstances, "given the lack of a clear indication that Rule 12.2(b) will apply to an entrapment defense, we find it an insufficient basis to exclude the proffered testimony in this case." 655 F.2d at 518. *See also United States v. Webb*, 625 F.2d 709, 710–11 (5th Cir.1980) (rule inapplicable where expert testimony was offered to show lack of propensity to commit a violent act); *cf. United States v. Ellsworth*, 738 F.2d 333, 335 (8th Cir.), *cert. denied*, 469 U.S. 1042, 105 S.Ct. 528, 83 L.Ed.2d 415 (1984) (ruling 12.2(b) inapplicable to proffered psychiatric testimony that taxpayer had a good faith belief income tax was voluntary).

We are persuaded by the dissent of Judge Rosenn in *Hill*. Rule 12.2(b) requires notice under Rule 12.2(a) with respect to a broad range of expert testimony—that "relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of his guilt...." The dissent reasons that:

"The purpose in requiring notice of mental condition evidence is as compel-

ling in an entrapment defense as it is in an insanity defense. In either case, the government must prepare for a psychiatric defense and it should have the requisite notice to avoid trial delay and provide adequate preparation."

655 F.2d at 520. *See also United States v. Edwards,* 90 F.R.D. 391, 397–98 (E.D.Va. 1981) (Rule 12.2(b) applies to testimony of diminished intellectual capacity or stupidity affecting mental state required for the income tax offense); *United States v. Hearst,* 412 F.Supp. 863, 870 (N.D.Cal. 1975) (Rule 12.2(b) applies to proffered testimony on mental and psychological brainwashing pressure).

In sum, we feel the notice requirements of Rule 12.2 apply to testimony such as that involved here. However, the application of the rule and discretionary rulings as to whether leave should be granted to file such notice on remand are matters on which we express no opinion. The circumstances are obviously far different now with the passage of time. The trial judge can reassess the matter on remand.

### C. *Claim of erroneous denial of suppression of evidence*

All the defendants except Jimmy Wright contend that the district court erroneously allowed the introduction of illegally seized evidence.[27] They challenge an allegedly warrantless search of the residence of Tammy and Eugene Fisher, an allegedly faulty affidavit to support the issuance of the search warrants, and they claim that there were overly broad searches conducted by the state officers under the search warrants.

**27.** These defendants filed a joint motion to suppress. The district court denied the motion by a written order before trial. The defendants' motion to reconsider the court's ruling was denied by the district court at trial. IX R. at 62–63. The issue was raised a third time by a further motion to reconsider which was denied by the district court in a minute order.

**28.** The tangible evidence seized pursuant to the warrant included an unfiled income tax return, firearms, and a truck.

### 1. Search of the Fishers' mobile home

On the morning of the July 20, 1988 raids, officers searched the suspected lab sites and the residences of Russell and Mary Sullivan and Steve Brown pursuant to search warrants issued by the District Judge of McCurtain County. The warrants authorized the seizure of specified contraband, lab equipment, and other described personal property. At about the same time, the officers also searched the mobile home of Tammy and Eugene Fisher, located approximately 50 yards from the Sullivan's residence.

The law enforcement officers characterized their search of the Fisher's mobile home as a "protective sweep," intended to assure their safety. IX R. at 19. Later that day the state officers obtained a further search warrant for the Fisher's residence and returned to carry out a comprehensive search of it.[28] The defendants contend that the initial search of the Fisher's mobile home was unlawful and that it tainted the seizure later that afternoon of evidence introduced at trial and used against defendant Eugene Fisher.

On this appeal, the government responds to the claims of error in the admission of evidence from the Fisher's mobile home and of alleged error in denial of suppression, arguing also the protective sweep theory. On examination of the affidavit and search warrant, we are persuaded that the protective sweep theory need not be reached. The trial judge was correct in his denial of suppression because, we conclude, the initial search warrant was supported by probable cause clearly shown by the affidavit of Officer Means. Moreover, the initial warrant adequately described the mobile home and authorized its search.[29] The

**29.** The search warrant describes the property to be searched as containing

two residences at said location, one of which is a wood frame house which faces west with brown composition shingles and outer walls which are mostly covered in gray rock; the second residence is a white mobile home which is located to the northeast of the first residence ap. [sic] 100 ft. which mobile home faces west and has a redwood deck on the west side and is fully skirted....

property description specifically covers a "white mobile home" and says it is one facing west with a redwood deck. It is true that in the concluding portion of the search warrant authorizing search there is a provision for "search of said person, vehicle and/or house, building and premises, the curtilage thereof...." Despite this singular reference to "house," we feel the warrant should be read in a practical sense and as a whole. Doing so, we hold that the warrant and authorization were intended to cover the mobile home. The phrase last quoted would appear to be a standard form of language of a boilerplate sort, and this should be read with the particular description of the property in the earlier part of the warrant.

In sum, we are convinced that the trial judge properly denied suppression of the unfiled or draft income tax return, firearms and truck seized at the Fisher's mobile home.

### 2. The affidavits.

■ Defendants contend that all of the search warrants were invalid because they were "saturated with false information" and argue that at the suppression hearing, Mr. Means admitted information in the affidavit was false, although he denied that the information was intentionally false. Brief in Chief of Appellant Eugene Fisher at 20–21.

After a hearing on the motion to suppress, the trial judge entered a written order with findings adverse to the defendants and denied the motion. I R., Item 20 at 6–9. The order found that the affidavit of probable cause, which was attached to the affidavits for the search warrants, relied on information from "previously reliable informants, the affiant's personal observations and confirmations of the informants' information, and the affiant's experience and expertise as a narcotic agent." Id. at 6. Under the totality of the circumstances standard of Illinois v. Gates, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2331–32, 76 L.Ed.2d 527 (1983), the search warrants were upheld. The trial judge noted that the task of the issuing magistrate under Gates was simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there was a fair probability that contraband or evidence of a crime would be found in a particular place.

The trial judge rejected the contention that there was knowingly false information furnished in the affidavits. The judge noted that the affiant admitted at the hearing on the motion to suppress that the allegation of the actual presence of a drug lab at more than one of the locations was an error, since the same affidavit was used for all four locations. However, the trial judge found this was an inadvertent error and that there was sufficient probable cause without that allegation in the other three affidavits for the magistrate to find probable cause. The judge found there was a substantial basis for the issuing magistrate to find probable cause for the issuance of all four warrants under Gates and United States v. Martinez, 764 F.2d 744 (10th Cir. 1985). I R., doc. 20, at 7.

We are satisfied that the findings of the trial judge were not clearly erroneous. The affidavit here in question did contain errors. The drug agent in charge of the raids admitted an erroneous identification of the drug locations.[30] The trial judge

---

30. At the suppression hearing, the following interrogation of the drug agent occurred:

Q. (Defense Counsel) Now, the attached affidavit paragraph 2, on Exhibit Number 109, is the residence of the Sullivan family; is that correct?
A. That's correct.
Q. And on paragraph—and on Exhibit Number 110, it's identical and it's a residence of the, I believe, Morgan family?
A. That's correct.

Q. And then on 111 it's the residence of the Fisher family; is that correct?
A. That's correct.
Q. So, in each instance in your affidavit you have advised the magistrate that there is a clandestine laboratory set up at each of these residence; have you not?
A. Yeah. I may have done that inadvertently.
Q. Now, you have done that and that's a false statement; isn't it, Mr. Means.

accepted the credibility of the drug agent in his statement that the mistakes were inadvertent. The defendants have not demonstrated that the findings of the judge were clearly erroneous. Under *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978), it was the burden of the movants to demonstrate deliberate falsity or reckless disregard for the truth by the affiant. We hold that the findings underlying the judge's order were not clearly erroneous and the denial of suppression was not error.

3. The claim of lack of particularity in the search warrants' descriptions

■ Lastly, the defendants say the warrant was overly broad and constitutionally deficient, because it merely directed the officers to seize a "laundry list" of personal papers likely to be found in any Oklahoma home, as well as drugs and drug paraphernalia and equipment. Brief in Chief of Appellant Eugene Fisher at 26.

The issue implicates the Fourth Amendment mandate that warrants not issue without "particularly describing the place to be searched, and the persons or things to be seized," *inter alia*. The trial judge considered the affidavits and warrants and their descriptions of the property which constituted evidence of criminal conduct.[31] The descriptions of the property as consti-

tuting evidence of criminal conduct were broad. We agree with the trial judge, however, that the language of the warrant was sufficiently specific in detail to avoid the evils of a general search. In *United States v. Lamport*, 787 F.2d 474, 476 (10th Cir. 1986), we upheld a description against such a claim when it included records of a physician constituting insurance billings, a record book of payments from insurance companies, checkbook stubs for two years, financial records and any other property that constitutes evidence of commission of the criminal offense. In light of the on-going drug activities described in the affidavits, and the nature of the operations, we feel the descriptions were sufficient to be valid under the constitutional standard.

## VII.

### *Prosecutorial Misconduct*

The defendants argue that they were denied a fair trial because, in his closing argument, the prosecutor improperly commented that the trial judge had already passed on the sufficiency of the evidence and improperly referred to matters outside the record. Although we reverse and remand for a new trial on other grounds, we address these arguments because of their importance and possible recurrence on retrial.

A. No. I think that—I had no intention to make a false statement, Mr. Hayes.
Q. Well, we're not—just leaving your intentions aside, the statement you made in the affidavit regarding clandestine laboratories located at the residences is false?
A. It's not an accurate statement.
VI R. at 68–69.

31. The trial judge quoted the description of property in his order denying suppression:

Certain dangerous substances, the same being narcotics, marijuana, hallucinogens, barbiturates, amphetamines and meth-amphetamines, listed in the schedules of the Uniform Controlled Dangerous Substance Act of the State of Oklahoma;
equipment and paraphernalia used in the manufacture, distribution, administration, utilization, or consumption of said controlled dangerous substances, with the unlawful intent to possess, use and distribute said sub-

stances in violation of the laws of the State of Oklahoma including flasks, heating mantles, hoses, glassware, chemical compounds, to wit: phenyl-acetic acid, phenyl acetone, Formamide, formic acid, acetic anhydride, acetone, hydrogen chloride gas, sodium acetate, and ether;
personal property consisting of records, receipts, papers, instrumentalities, and documents related to an on-going suspected criminal enterprise in the trafficking of and conspiracy to distribute, controlled dangerous substances, including but not limited to, phone records and bills, utility bills and/or receipts, address books, records, photographs as well as undeveloped film and negatives, documents and receipts of travel, diaries, all monies, receipts, records and documents which show unusual, or suspect monetary transactions and receipts or keys to safety deposit boxes.
I R., Item 20 at 8.

## A. Comment on the Sufficiency of the Evidence

During the prosecutor's final argument to the jury, he insinuated that the trial judge had already determined that there was sufficient evidence to convict the defendants. The prosecutor stated:

> And don't believe this defense lawyer when he says that all we have to do is decide to prosecute and that's the end of the story. It's not. There's always a judge involved. And you can be assured, based on the conduct of this trial, that this judge isn't going to put up with any Mickey Mouse about the government trying to railroad somebody into a conviction if the evidence does not substantiate it.

XVII R. at 2204. At the conclusion of the argument, defense counsel moved for a mistrial, which motion was overruled. *Id.* at 2247. The trial court acknowledged that the prosecutor's comment was "uncalled for," but ruled that the misconduct was "not sufficiently egregious" to warrant a mistrial. *Id.*

We think the prosecutor's comment was highly improper. *See United States v. Gambert,* 410 F.2d 383, 384–85 (4th Cir. 1969). The clear implication of the prosecutor's comment was that if the evidence was insufficient to convict the defendants, the trial judge would have dismissed the charges. Such comments denigrate the role of the jury and should not be tolerated. Not too unlike the misleading portrayal of the jury's role at issue in *Caldwell v. Mississippi,* 472 U.S. 320, 333, 105 S.Ct. 2633, 2642, 86 L.Ed.2d 231 (1985), the prosecutor's argument "create[s] an intolerable danger that the jury will choose to minimize the importance of its role."

In *Gambert,* the prosecutor made the following statement in his closing argument:

> You all are the ones to decide whether I have proved the facts under the law. But legally, I have satisfied the court that it can go to the jury for your determination.

410 F.2d at 384. The Fourth Circuit reversed, reasoning that "the jury may well

have been left with the impression that the trial judge had been persuaded by the prosecution's case," *id.,* and stating further:

> In arguing a close case before the jury, it is manifestly unfair for the prosecutor to throw into the scales the weight of the judge's influence by intimating, even mildly, that the judge thinks the defendant guilty.

*Id.* at 385. Because we must reverse on other grounds, we need not decide whether in the context of this trial this comment, standing alone, would warrant reversal. We nevertheless emphasize that such comment was clearly improper and should not occur on retrial.

## B. Reference to Matters Outside the Record

During trial and during his closing argument, the prosecutor read several times from a purported transcript of the tape recording which had been played for the jury at the close of the government's case. *See, e.g.,* XVI R. at 1830–32; XVII R. at 2040–42, 2173–76. The transcript itself was never admitted in evidence as an exhibit, and it was never determined to be accurate. Defendants argue that because the recording was substantially inaudible, it was improper for the prosecutor to read passages from the purported transcript, thereby reinforcing his version of selected portions of the conversation that the jury may or may not have heard.

We have heard the entire recording and, although we do not conclude that the trial court abused its discretion in permitting the playing of the tape, *see United States v. McIntyre,* 836 F.2d 467, 469–70 (10th Cir.1987), the tape is of an extremely poor quality, inaudible in numerous places, and difficult to understand because of a persistent echo due to the use of more than one microphone. Even if the jury was able to discern a damaging statement here and there, we cannot fairly say that the jury could hear and would have found that the statements from the purported transcript were made as the prosecutor quoted in his closing argument. Although the court admonished the jury to rely on its own recol-

lection of the evidence, the prosecutor should not have read from the purported transcript, the accuracy of which was not determined and which was *not* in evidence.[32]

## VIII.

### The Brady Claim

 The defendants argue that they were deprived of due process because the government destroyed handwritten notes made during Agent Means' investigative interviews with the three government informants. The issue arose at trial when defense counsel's cross examination of Melvin and Evelyn Rogers disclosed that Means had conducted as many as thirty-two interviews with the informants, whereas the government provided interview notes for only five of those meetings.[33] In some but not all cases the government apparently provided defense counsel with a typewritten report of the interview in lieu of the agent's handwritten notes. According to the defendants' briefs, when defense counsel confronted the prosecutor with this information, he was informed that Means had "shredded" the notes pursuant to "departmental policy." *See* Wright Br. at 17; Sullivan Br. at 7. Thereafter, defense counsel filed a motion to dismiss for suppression of evidentiary material in violation of *Brady v. Maryland*, 373 U.S. 83, 83

S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court denied the motion by minute order.[34]

The government acknowledges that some "handwritten drafts [of final reports] based on field notes and recollection" were destroyed, along with a note written on a napkin, but otherwise disputes defendants' factual allegations. Brief of United States at 26. The government further alleges that "handwritten draft field notes were produced to defendants," and that the substance of the "shredded" notes was embodied in reports also furnished to the defendants. *Id.* The government characterizes the defendants' claim as "speculative" and argues that in any case the defendants have not demonstrated that the missing evidence had any exculpatory value or that it was destroyed in bad faith, *id.* at 25–26, citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

In *Youngblood*, the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58, 109 S.Ct. at 337. The Court distinguished the government's failure to preserve only "potentially useful evidence" from its obligation to disclose "material exculpatory evidence" under *Brady* as follows:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in

---

**32.** The trial court acknowledged that the prosecutor's repeated and deliberate efforts to emphasize what the jury may or may not have heard was improper, *see* XVI R. at 1831, and properly cautioned the jury to consider only those portions of the tape that it heard and and could understand. *See, e.g.,* XIV R. at 1245–46, 1251; XVII R. at 2042, 2165–66. We are persuaded, however, that despite the court's efforts to cure the effect of the prosecutor's improper use of the transcript, the damage had already been done. Significantly, the court did not give any limiting instruction after the prosecutor quoted extensively from the transcript during his closing argument. The court overruled defense counsel's objection and motion for mistrial without comment. XVII R. at 2247.

**33.** Melvin Rogers testified that he had as many as six meetings with Agent Means and that Means took notes at all but one meeting. X R. at 249. Defense counsel, however, was provid-

ed with copies of interview notes for only one meeting with Melvin Rogers. Similarly, Means' own chronology of events reveals that he had meetings, either in person or by telephone, with Evelyn Rogers 16 times between May 9, 1988, and July 21, 1988. Defense counsel was furnished with Means' handwritten notes for only four of those meetings. Finally, Means' chronology reveals that he had 12 meetings, either in person or by telephone, with the informant Steve Howell between May 22 and July 21, 1988. Defense counsel, however, was not provided with any notes or reports of interviews with Steve Howell.

**34.** Defense counsel raised the matter again at trial, *see* XI R. at 467–68, 556, and the court again denied defendant's motion to dismiss. *Id.* at 594–95. Because the defendants request that the case be dismissed, and not merely reversed and remanded for a new trial, this issue is not moot.

*Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the state to preserve evidentiary material of which no more can be said than that it ... might have exonerated the defendant.

*Id.; see also California v. Trombetta*, 467 U.S. 479, 491, 104 S.Ct. 2528, 2535, 81 L.Ed.2d 413 (1984) (in the absence of a showing of bad faith or official animus, "the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve [potentially exculpatory] breath samples in order to introduce the results of breath analysis tests at trial.").

As is clear from *Youngblood*, however, if the interview notes are Brady material, then the good or bad faith of the government is irrelevant. *See Youngblood*, 488 U.S. at 63, 109 S.Ct. at 340; *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. Here the defendants argue that the agent's notes would have revealed inaccuracies and inconsistencies in the trial testimony of key prosecution witnesses and therefore would have been useful to impeach the credibility of those witnesses. "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (citing *Giglio v. United States*, 405 U.S. 150,

154, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972)); *see United States v. Buchanan*, 891 F.2d 1436, 1443 (10th Cir.1989). The Supreme Court has long recognized that "[s]uch evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley* 473 U.S. at 676, 105 S.Ct. at 3380 (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197); *see Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Where, as here, "the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766 (quoting *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177). Thus, to the extent the defendants' allegations are true, and assuming the lost evidence was also "material" under *Brady* (*see Giglio*, 405 U.S. at 154, 92 S.Ct. at 766), the government's failure to preserve the evidence would constitute a denial of due process regardless of the good or bad faith of the government.[35]

Unfortunately, on this record we are unable to determine the merits of the parties' respective claims. The trial court denied defendants' motion to dismiss without conducting an evidentiary hearing or making any findings of fact.[36] The court did not determine whether the lost evidence would be material, *see Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, or if not, whether the government nevertheless destroyed the evidence in bad faith.[37] Because either or

---

**35.** The defendants argue in the alternative that even if the interview notes were not Brady material, the defendants were deprived of due process because Agent Means destroyed the evidence in bad faith. *See* Br. of Russell Sullivan at 7–11.

**36.** When the court denied defendants' motion to dismiss from the bench, it did not express its reasons for doing so. *See* XI R. at 595.

**37.** This case is strikingly similar to the pre-*Brady* case of *Killian v. United States*, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). In *Killian*, the government relied in its case in chief on an investigatory report prepared by the Federal Bureau of Investigation. Prior to trial, however, the FBI Agents who prepared that report destroyed the preliminary notes they had made while interviewing witnesses. The petitioner ar-

gued that these notes would have been helpful to his defense and that the agents had violated the Due Process Clause by destroying this exculpatory evidence.

The Solicitor General, however, represented that the agents' notes were made only for the purpose of transferring the data thereon to the required receipts, and that, having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practices. *See* 368 U.S. at 242, 82 S.Ct. at 308–309. The Court acknowledged that the notes might have contributed to the petitioner's defense, but held that if the Solicitor General's factual representations were true, the destruction of the notes would not "constitute an impermissible destruction of evidence nor deprive petitioner of any right." *Id.* The Court remanded the case to the district court for a hearing to

both factual conclusions could be determinative on this issue, on remand a hearing should be held on these questions.[38]

## IX.

### Sufficiency of the Evidence

All of the defendants except Jim Wright and Eugene Fisher claim that the evidence is insufficient to support their convictions for one or more of the counts charged in the indictment. We address these claims because if they have merit, a retrial would be prohibited by the Double Jeopardy Clause. *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2151, 57 L.Ed.2d 1 (1978).

### A. The Conspiracy Counts

Tammy Fisher argues that the evidence presented at trial failed to establish beyond a reasonable doubt that she knowingly participated in either of the two charged conspiracies. Indeed, as to the 1988 conspiracy charged in Count 2, she argues that the evidence failed to establish any participation in the conspiracy at all, much less that she knowingly and voluntarily became a part of it.

#### 1. Count 1.

 The evidence of Tammy Fisher's participation in the amphetamine "cooks" in 1985–86 may be briefly stated. The

government's informant Melvin Rogers testified that at one of the first cooks, Tammy prepared and served food and washed clothes for the four men who were manufacturing drugs in an outbuilding on her property and was present when they discussed the lab's progress. IX R. at 111.[39] Government informant Evelyn Rogers also testified that at one of the cooks Tammy allowed the men to "go to her trailer, take a shower, [and] eat." X R. at 307. She also testified that on one occasion Tammy, together with Evelyn, Melvin and Eugene, walked to the lab site to "shut [it] off for some reason. I don't know what." *Id.* at 308.[40] Evelyn also placed Tammy at the second cook, *id.* at 311, but did not elaborate. Later, however, she testified that "[a]bout January" Tammy helped Eugene Fisher and Steve Howell weigh phenylacetic acid. *Id.* at 377–78. Government informant Steve Howell likewise testified that on one occasion, in January or February of 1986, Tammy helped weigh chemicals. XI R. at 492–93. Finally, Melvin Rogers testified that on the same occasion Tammy helped pack "the groceries, the bedding, and stuff like that" into a truck when the lab site had to be moved from behind Eugene Fisher's house to the Sullivan's house. IX R. at 121–23. Significantly, he also testified that they moved the lab during "early morning" while "it was still dark." *Id.* at 123.

---

determine whether the Solicitor General's representations were true, and if not, for a new trial. *Id.* at 244, 82 S.Ct. at 309.

**38.** We are mindful of the difficulty of this task. As the Supreme Court observed in *Trombetta*, "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of defining the import of materials whose contents are unknown and, very often, disputed." 467 U.S. at 486, 104 S.Ct. at 2532. Nevertheless, findings following the evidentiary hearing will afford the best resolution of the constitutional claim.

Finally, we note that on the present record we cannot conclude as a matter of law that the interview notes were immaterial, or that their likely impeachment value would be insubstantial. *See generally United States v. Buchanan*, 891 F.2d at 1443–44.

**39.** The relevant portion of the transcript reads as follows:

Q. Now, during the times that you were at Tammy and Eugene's trailer, was Tammy Sullivan there?

A. Yes, sir.

Q. Did she do anything with regard to your stay?

A. Well, she washed our clothes for us. She would cook for us. That's about it.

Q. Did you ever discuss with her what you were doing?

A. Yeah, I mean, you know, we'd talk about how it was going. You know, if it was going all right or whether we was having any trouble, you know, that kind of stuff.

IX R. at 111. *Accord id.* at 113.

**40.** Evelyn explained as follows:

We went back down there to start it up, because Eugene turned on the water and it nearly blew everything up, the pressure, the air or something. And we went down there that time and walked down there.

*Id.*

While the evidence against Tammy Fisher on Count 1 is not extensive, we believe it is sufficient to support the jury's verdict. The most damaging evidence against Tammy is, of course, the testimony that she helped weigh chemicals and helped pack groceries and bedding into a truck used to move lab equipment to another location. A rational jury could reasonably infer from those acts that Tammy Fisher knew the essential objectives of the conspiracy and knowingly became a part of it. That is sufficient. *See, e.g., United States v. Savaiano*, 843 F.2d 1280, 1296 (10th Cir.1988).

### 2. Count 2.

■ The evidence against Tammy Fisher with respect to Count 2, the 1988 conspiracy, is insufficient. There is no evidence in the record that Tammy ever participated in the 1988 conspiracy to manufacture amphetamines. The government points only to Evelyn Rogers' testimony that after she had delivered the glassware at the Sullivan's, Tammy alerted her father to the presence of an unfamiliar, slowly moving car outside the Sullivan home.[41] The government argues that this evidence of Tammy's "counter-surveillance" activity is sufficient to connect her to the conspiracy. Government's Brief at 34–35.

We do not agree. It cannot be reasonably inferred from proof of Tammy's equivocal act that she knew the existence and scope of the 1988 conspiratorial objective, or believed that her actions played any role in achieving that objective. Such gossamer evidence is not proof sufficient to support a criminal conviction beyond a reasonable doubt. Therefore, Tammy's conviction on Count 2 is reversed and a judgment of acquittal must be entered on that count. *Burks*, 437 U.S. at 18, 98 S.Ct. at 2151.

### B. *Attempted Manufacture of Amphetamine*

■ Mary Sullivan challenges the sufficiency of the evidence to sustain her conviction on Count 3 of the indictment for attempted manufacture of amphetamine.[42] She contends that there is no evidence that she either participated in the attempt to manufacture amphetamine, or that she aided and abetted the attempted manufacture of amphetamine. We disagree.

■ The crime of attempt requires proof of (1) the requisite criminal intent, and (2) an act or omission constituting a "substantial step" toward commission of the substantive offense. *United States v. Savaiano*, 843 F.2d at 1296; *see also United States v. Remigio*, 767 F.2d 730, 733 (10th Cir.), *cert. denied*, 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985). Viewed in the light most favorable to the government, there was evidence that Mary Sullivan spoke with Evelyn Rogers on the phone concerning the proposed amphetamine cook; that she met with Evelyn Rogers in a motel room to arrange for the glassware delivery; that she participated in the glassware delivery to the Sullivan home, and the concealment of the glassware behind the house; that she traveled to Irving, Texas, with her husband to ar-

---

**41.** The relevant portion of the transcript reads as follows:

Q. Did anything out of the ordinary happen then?
A. Well, Tammy started home, and she got to the door, or outside. And she came back and hollered for Russ.
Q. Now, what did she holler at Russ?
A. She said, "come here, daddy," or "come to the door, daddy." And he walked outside.
Q. All right. What did she say then?
A. *I don't know what she said out there.*
Q. All right. And what is the next thing that you saw or heard happen?
A. Russ came back and he was real upset. He said that there was two cars had just went over the hill, up the road, driving real slow,

and he said he felt like it might be the feds. So he said I'm going to get my gun and go see what I can find out.
X R. at 336 (emphasis added).

**42.** The government has suggested that we need not reach this issue under the concurrent sentence doctrine. *See United States v. Montoya*, 676 F.2d 428 (10th Cir.1982). However, the district court imposed a $50 special assessment on each count, in addition to the concurrent prison and parole terms, pursuant to 18 U.S.C. § 3013 (1988). The concurrent sentence doctrine, therefore, could not apply. *See Ray v. United States*, 481 U.S. 736, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987).

range for the delivery of phenylacetic acid by Steve Howell; that she participated in the recorded conversation of July 3, 1988, in which she discussed the planned amphetamine cook; and that on the day before the lab was set up, she told Steve Howell that she had been to the library "studying up ... on cooking procedures." *See* X R. at 330–36, 343–44, 367, 375; XI R. at 522–25, 557.

We are convinced there is sufficient evidence from which a rational trier of fact could find Mary Sullivan guilty of attempted manufacture of amphetamine beyond a reasonable doubt.

### C. *Illegal Possession of a Firearm*

1. Count 5.

 Defendants Russell and Mary Sullivan challenge the sufficiency of the evidence to sustain their convictions on Count 5 for possession of an unregistered firearm, an AR–15 rifle, in violation of 26 U.S.C. § 5861(d). They claim the government failed to prove the essential element of possession.[43] Russell Sullivan challenges on the same basis his conviction on Count 7 for illegal possession of the same firearm after former conviction of a felony in violation of 18 U.S.C. § 922(g). The government does not point to any evidence of actual possession, but argues that the evidence presented at trial is sufficient to support an inference of joint constructive possession by Mary and Russell Sullivan. We agree.

 It is well settled that the required "possession" for purposes of 26 U.S.C. § 5861(d) includes both actual and constructive possession. *United States v. Cardenas,* 864 F.2d 1528, 1533 (10th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989). Constructive possession exists when a person does not have actual possession, but "knowingly holds the power to exercise dominion and control" over an object. *Cardenas,* 864 F.2d at 1533 (quoting *United States v. Medina-Ramos,* 834 F.2d 874, 876 (10th Cir.1987)). Furthermore, possession need not be exclusive; it may be joint, and therefore does not require that exercise of dominion and control by others be disproved. *United States v. Rivera,* 844 F.2d 916, 926 (2d Cir.1988).

The government points to the following evidence in support of the jury's verdict. First, Evelyn Rogers testified that when she met with Mary and Russell Sullivan in Irving, Texas, Russell displayed a "clip" that he could drop into his AR–15 in just a matter of seconds that would make it "rock and roll." X R. at 375–76. Second, Steve Brown (Mary Sullivan's son) testified that he purchased the AR–15 in question at a pawn shop and had given it to his younger brother, since deceased. XVII R. at 1914. He testified that he had taken the AR–15 and several other guns to his mother's house after some of his guns were stolen, and that after his brother's death, "we

**43.** The defendants also attack the government's evidence of lack of registration on two fronts. First, defendants argue that the certificates of non-registration, dated September 12, 1988, are not competent proof that the firearm in question was not registered to Russell or Mary Sullivan more than two months earlier, on July 20, 1988. They contend that a jury could not infer from that evidence that the firearm was not registered on the date of the alleged violation. Similar arguments were considered and rejected in *United States v. Allen,* 842 F.2d 1265, 1266 (11th Cir.1988), and *United States v. Mayo,* 705 F.2d 62, 76 n. 10 (2d Cir.1983). We agree with the reasoning expressed by both courts.

Second, defendants object to the admissibility of the certificates on the ground that they were hearsay and that the government did not comply with its discovery obligations under Rule 16 of the Federal Rules of Criminal Procedure.

We disagree. Public records are admissible as an exception to the hearsay rule, Fed.R.Evid. 803(8), and the government may prove the absence of a record of proper registration with a certified copy of a public record, such as the one introduced here, certifying that diligent search failed to disclose evidence of the registration in question. *See* Fed.R. of Evid. 803(10), 902(4). Finally, we reject the defendant's argument that the government violated Rule 16 because it furnished defense counsel with a photocopy of each certification of non-registration *before* they were signed by the certifying officer or affixed with the requisite seal. Although it would have been preferable to furnish defendants with copies of signed certificates bearing the requisite seal, the government's failure to do so does not constitute a violation of Rule 16 and did not preclude their introduction into evidence.

moved the gun cabinet and stuff" into his mother's bedroom. *Id.* at 1915. Mary Sullivan admitted that the AR–15 belonged to her deceased son and that she kept all of his property after his death, including the guns. *Id.* at 2073–74. Finally, the machine gun was found in the master bedroom of the Sullivans' home along with a nearby auto sear and 30–shot clips. XII R. at 868–69. The government argues, and we agree, that this is sufficient evidence to support an inference of joint constructive possession. *See, e.g., United States v. McCoy,* 781 F.2d 168 (10th Cir.1985)

The defendants argue that the evidence of dominion and control is too tenuous here to amount to proof beyond a reasonable doubt. In particular, Mary Sullivan argues that there was no evidence, direct or circumstantial, that she slept in or otherwise had knowledge of the contents of the room in which the gun was found. She relies on *United States v. Bonham,* 477 F.2d 1137 (3d Cir.1973) (en banc), for the proposition that joint occupancy of a bedroom is insufficient evidence on which to base an inference of criminal possession. Finally, she correctly asserts that "[t]here was no evidence concerning where in the bedroom the gun was found, whether it was in plain view or hidden, or anything else about the circumstances." Appellee's Brief at 30. Russell Sullivan argues that he was eight to ten miles away from his home when the AR–15 was seized; that none of his fingerprints were found on the AR–15; and that the government did not introduce any evidence that he exercised dominion and control over the room in which the firearm was found.

Although we agree that joint occupancy of a bedroom, without more, would be insufficient to support this conviction, the evidence in this case goes somewhat beyond that. The evidence presented at trial shows some connection between each defendant and the firearm, and supports the inference that each defendant was aware of the presence of the firearm in the master bedroom. The evidence in this case is stronger, for example, than the evidence we held sufficient in *United States v. Miles,* 772 F.2d 613 (10th Cir.1985). On balance, we think there is sufficient evidence from which a jury could reasonably infer that each of the Sullivans constructively possessed the unregistered AR–15 rifle.

### 2. Count 4.

 Russell and Mary Sullivan, Eugene Fisher, Steve Brown and Jimmy Wright also challenge the sufficiency of the evidence to sustain their convictions on Count 4 for "knowingly and unlawfully us[ing] or carrying firearms during the commission of a felony ..., to wit: conspiracy to manufacture amphetamine,...." in violation of 18 U.S.C. § 924(c)(1). In judging the sufficiency of the evidence, we are bound to view the proof presented in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt. *United States v. Wright,* 826 F.2d 938, 946 (10th Cir.1987); *United States v. Twilligear,* 460 F.2d 79, 81–82 (10th Cir.1972). We conclude that the record contains sufficient evidence to sustain the convictions of the defendants other than Mary Sullivan, and hold that her conviction on this count must be set aside.

In *United States v. McKinnell,* 888 F.2d 669, 675 (10th Cir.1989), we agreed with other courts that the "uses" element of § 924(c)(1) is satisfied where a defendant has "ready access" to a firearm and it "was an integral part of his criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed." *United States v. Matra,* 841 F.2d 837, 843 (8th Cir.1988). *See also United States v. Meggett,* 875 F.2d 24, 29 (2d Cir.1989) (five firearms secreted about a defendant's apartment). Here there was evidence that there was a substantial number of weapons at the Sullivan and Fisher residences, that it was a common practice for the male defendants to carry firearms, that three of the defendants possessed weapons at the laboratory site, and that two defendants took weapons to investi-

gate possible trouble with the "feds."[44] We feel the evidence is sufficient to sustain the convictions of Eugene Fisher, Steve Brown, Jimmy Wright and Russell Sullivan on Count 4.

However, we are unable to agree with the government that its evidence was sufficient with respect to the conviction of Mary Sullivan on Count 4. The government does not cite any specific evidence to indicate that she carried or used a firearm. We agree that there was sufficient proof that both Mary and Russell Sullivan had joint and constructive possession of the AR–15 rifle at their home, but that was in connection with a conviction for *possession* of an unregistered firearm. Count 4, however, is a different substantive charge under 18 U.S.C. § 924(c). As to that offense, we are required to determine whether the proof was sufficient to sustain the charge under that section.[45] We are persuaded to agree with the Ninth Circuit's construction of the statute in *United States v. Stewart*, 779 F.2d 538, 540 (9th Cir.1985) (opinion of Kennedy, J.), that "the evident purpose of [§ 924(c) ] was to impose more severe sanctions where firearms facilitated, or had the potential of facilitating, the commission of a felony." This results from the inclusion within the statutory elements of the language that the using or carrying of the firearm must be "during and in relation to" a crime of violence or a drug trafficking crime. With this in mind, we do not find sufficient evidence in this record that Mary Sullivan carried or used firearms "during and in relation to" the underlying drug conspiracy offense. The constructive possession proof sufficient with respect to the charge concerning possession of the unregistered AR–15 rifle is not sufficient to sustain the Count 4 conviction within the meaning of § 924(c). A conviction must be supported by sufficient substantial evidence, and not mere suspicion of guilt. *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987).

In sum, we hold that the evidence was sufficient to support the convictions of defendants Eugene Fisher, Steve Brown, Jimmy Wright and Russell Sullivan on Count 4. Therefore, their argument that retrial of them on this Count 4 charge would be barred by Double Jeopardy principles, *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2151, 57 L.Ed.2d 1 (1978), is without merit. However, the claim to this effect by Mary Sullivan is good, and a judgment of acquittal for her with respect to Count 4 will be entered by the district court on remand. *Id.* at 18, 98 S.Ct. at 2151.

### D. Cultivation of Marijuana

Finally, defendants Russell and Mary Sullivan claim that the evidence does not support their convictions on Count 6 of the indictment for manufacturing (cultivating) marijuana.[46] The defendants contend

---

**44.** Donald Wayne Long testified that Jimmy Wright informed him that Russell Sullivan and Wright were armed at the laboratory site. XVII R. at 2118–20. Steve Howell testified that at the laboratory, Howell asked Eugene Fisher and "Whiskers" (Jimmy Wright) if they had guns. Fisher said "yes" and Wright "patted on his back pocket." XI R. at 585.

Evelyn Rogers testified that while she was at the Russell Sullivan residence in July of 1988, Sullivan telephoned Steve Brown to come up because he thought "there might be trouble." X R. at 341–42. Sullivan left to find out if the "feds" were there, or just someone else. X R. at 341. Sullivan was armed with a rifle and Steve with a small handgun. *Id.* at 341–44.

Moreover, during the raid on the laboratory site on July 20, 1988, Jimmy Wright, Eugene Fisher and Russell Sullivan were arrested in the trailer that served as the laboratory. XII R. at 1006. During that raid, Senior Agent Duncan

seized three guns from the trailer. XII R. at 780.

Tammy Sullivan Fisher was not convicted on Count 4 and, therefore, there is no question before us concerning the sufficiency of the evidence on Count 4 with respect to her.

**45.** We have already held in Part III–A, *supra*, that as a matter of *pleading*, Count 4 is sufficient due to our *Bullock* opinion. However, as a matter of *proof*, the evidence is not sufficient as to Mary Sullivan. It does not show that the AR–15, or the gun collection of Mary Sullivan's son, James Wesley, were within such access as to be an "integral part of [her] criminal undertaking and [that] its availability increased the likelihood that the criminal undertaking would succeed." *McKinnell*, 888 F.2d at 675.

**46.** 21 U.S.C. § 802(14) defines "manufacture" broadly to include "production" which in turn is

that the evidence is insufficient to show that either defendant knowingly manufactured the marijuana.[47]

The government devotes only two very short paragraphs in its brief to this issue. It does not cite record evidence except to rely exclusively on one short passage from the tape recorded conversation of July 3, 1988 in support of its conclusory assertion that "[t]he evidence was sufficient to sustain the challenged convictions of appellants." Brief of the United States at 57.

When the search warrants were executed at the Sullivan residence on July 20, 1988, agent Higbee located 61 live marijuana plants growing in pots "behind the pond and down a little ways." XIII R. at 1116. Higbee estimated that the location of the marijuana was approximately 100 yards from the Sullivan residence, *id.* at 1125, but admitted that he did not know who owned the property where the plants were located. *Id.* at 1124. (The government did not introduce any evidence of ownership of the land in question.) Higbee also testified that there was a path leading from the Sullivan residence in the general direction of the marijuana. *Id.* at 1118. He admitted, however, that the marijuana was on the opposite side of an approximately seven-acre pond, *id.* at 1127, and to get to the marijuana he had to walk "up over a dam." *Id.* at 1123. The government points to the tape recorded conversation of July 3, 1988, involving Russell and Mary Sullivan, Steve Howell, and Evelyn Rogers, as evidence of

Russell and Mary Sullivan's dominion and control of the marijuana.[48]

We think the evidence, both direct and circumstantial, is insufficient to establish the required elements of possession or scienter. Higbee's testimony clearly is insufficient to support an inference of knowing cultivation as to either Russell or Mary Sullivan. There is no substantial evidence that either defendant participated in growing the marijuana plants, or that they knew the plants existed. The testimony that the plants were growing in the area near the Russell's home, without more, is insufficient. The sounds on the tape would support only a guess as to guilt.

Evidence that raises only a suspicion of guilt cannot sustain a criminal conviction. Accordingly, Russell and Mary Sullivan's convictions on Count 6 are REVERSED with instructions to enter judgments of acquittal as to each defendant on that count.

## X.

### Improper Amendment of the Indictment

■ Defendants contend that their sentences on Counts 1 and 2 were improperly based on 21 U.S.C. § 846 when, prior to what they charcterize as an impermissible amendment of the indictment by the trial court, the indictment could only be read to charge an offense under the general con-

---

defined in section 802(21) to include "planting, cultivation, growing, or harvesting...." The trial court similarly instructed the jury. XII R. at 2226–27.

47. The defendants further argue, relying on *United States v. Gay,* 774 F.2d 368 (10th Cir. 1985), that the quantity of marijuana seized was insufficient to support an inference of intent to distribute. That argument is misplaced. Manufacture of marijuana and possession of marijuana with intent to distribute are distinct offenses. *See United States v. Zamora,* 784 F.2d 1025, 1029 (10th Cir.1986). The defendants in this case were charged with and convicted of only the former offense. I R. doc. 1, at 11; *id.* docs. 38 & 39. Proof of manufacture can be shown without any evidence of intent to distribute. *United States v. Miller,* 870 F.2d 1067, 1071 (6th Cir.1989).

48. According to the U.S. Attorney's transcript of the tape recording, which was not admitted into evidence, Russell Sullivan is quoted as saying: "I don't know if it's ever going to mature, but we've got some growing out there in a good place. Because that's what we was counting on is a weed crop this year. You know, cause we didn't know where Melvin and Evelyn was and we didn't know your last name." The tape itself was played for the jury over the defendants' objection that it was inaudible.

We have listened to the tape carefully and do not believe the purported language was sufficiently audible to justify the conclusion that any incriminating statement was made. Only a few words are distinct enough to hear, and those are often unclear. (For example, "weed" is easily confused with "wheat.").

spiracy statute, 18 U.S.C. § 371.[49] Although defendants style this claim as a challenge to the legality of their sentences, the substance of their argument is that the trial court improperly amended the indictment. Thus, we address defendants' claim because if it has merit, retrial on the "amended" indictment would be violative of the Fifth Amendment grand jury guarantee. For reasons that follow, we hold that the trial court did not impermissibly amend the indictment.

Counts 1 and 2 of the indictment each charged a conspiracy to violate the narcotics laws in violation of 21 U.S.C. § 846.[50]

**49.** Defendants were given concurrent sentences under 21 U.S.C. § 846 ranging from thirteen to twenty years' imprisonment, whereas, 18 U.S.C. § 371 is punishable by no more than five years imprisonment.

**50.** The charging paragraphs of Counts 1 and 2 are reproduced below.

### COUNT 1
(21 U.S.C. § 846)

A. *Objects of the Conspiracy*

Beginning on or about September 1, 1985, and continuing until on or about May 1, 1986, in the Eastern District of Oklahoma, and elsewhere, [the defendants], did wilfully and knowingly combine, conspire, confederate, and agree together and with diverse others both known and unknown to the Grand Jury to commit offenses against the United States, in violation of Title 21, United States Code, Section 846, as follows:

(1) To knowingly and intentionally manufacture amphetamine, a Schedule II, stimulant controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(2) To knowingly and intentionally possess with intent to distribute amphetamine, a Schedule II, stimulant controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(3) To knowingly and intentionally distribute amphetamine, a Schedule II, stimulant controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(4) To knowingly and intentionally use firearms in the commission of the offenses listed above, in violation of Title 18, United States Code, Section 924(c).

. . . .

### COUNT 2
(21 U.S.C. § 846)

A. *Objects of the Conspiracy*

Beginning on or about May 1, 1988, and continuing until on or about July 20, 1988, in the Eastern District of Oklahoma, and elsewhere, [the defendants], did wilfully and knowingly combine, conspire, confederate, and agree together and with adverse others

However, in addition to alleging three violations of 21 U.S.C. § 841(a)(1), as "objects of the conspiracy," each count also includes a firearms offense (in violation of 18 U.S.C. § 924(c)) as a fourth conspiratorial objective. At trial the court recognized that because § 846 encompasses only those "offense[s] defined in this subchapter,"[51] the Title 18 firearms offense was not a proper objective of the alleged conspiracies. Accordingly, the trial court struck the firearms objective from Counts 1 and 2 of the indictment as surplusage and instructed the jury to consider only the Title 21 narcotics objectives.[52]

both known and unknown to the Grand Jury to commit offenses against the United States, in violation of Title 21, United States Code, Section 846, as follows:

(1) To knowingly and intentionally manufacture amphetamine, a Schedule II, stimulant controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(2) To knowingly and intentionally possess with intent to distribute amphetamine, a Schedule II, stimulant controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(3) To knowingly and intentionally distribute amphetamine, a Schedule II, stimulant controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(4) To knowingly and intentionally use firearms in the commission of the offenses listed above, in violation of Title 18, United States Code, Section 924(c).

**51.** Prior to its amendment on November 18, 1988, § 846 provided:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846 (1982)

**52.** It is not clear from the record how this issue arose or on whose motion the trial court struck the language in question. The trial judge first alluded to the problem on the second day of trial in the context of a defense objection to testimony concerning the possession of firearms during the 1988 conspiracy. The court commented that the potential problem with counts one and two had "been brought to my attention," X R. at 385, but the record does not disclose a motion by either party to strike the language in question.

After a weekend recess, the court requested briefing on the question by both parties. *Id.*

Defendants now contend that because the firearms offense, together with the narcotics offenses, *would* be a proper objective of the general conspiracy statute, 18 U.S.C. § 371, the indictment—as originally returned by the grand jury—can only be read to charge a conspiracy under 18 U.S.C. § 371 and not the more specific conspiracy to violate the narcotics laws under 21 U.S.C. § 846. Thus, by striking the § 924(c) objective, defendants conclude, the trial court impermissibly amended the indictment prejudicing the defendants to the extent that their sentences exceed the five-year maximum under 18 U.S.C. § 371. We disagree.

■ We accept the defendants' premise that a firearms offense under Title 18 is not a cognizable objective of a § 846 conspiracy.[53] The statutory language is clear: 21 U.S.C. § 846 encompasses only those "offenses defined in this subchapter," referring to Title II of the Controlled Substances Act, Pub.L. No. 91–513, 84 Stat. 1242 (1970) (codified at 21 U.S.C. §§ 801–904). Thus, a violation of 18 U.S.C. § 924(c) cannot in law be the object of a conspiracy to violate the Controlled Substances Act.[54]

■ The flaw in defendants' argument is their assumption that because § 846 is not broad enough to encompass a violation of 18 U.S.C. § 924(c), the entire conspiracy (i.e., embracing *each and every* alleged conspiratorial objective) must be charged under a more general conspiracy statute. It is well-settled that "an indict-

ment may charge numerous offenses or the commission of any one offense in several ways." *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985). "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *Id.* We think those principles apply even where, as here, one of the alleged means of committing the offense is erroneously pleaded. The validity of a conspiracy conviction does not depend on proof of all of the alleged objectives of the conspiracy. *Newman v. United States*, 817 F.2d 635, 638 (10th cir.1987). "It is well settled that when an indictment charges a conspiracy to violate more than one statute, the jury may find the defendant guilty if it believes beyond a reasonable doubt that the defendant conspired to violate any one of the cited statutes." *Id.; see also Miller*, 471 U.S. at 136, 105 S.Ct. at 1815 ("each offense whose elements are fully set out in an indictment can independently sustain a conviction"); *Braverman v. United States*, 317 U.S. 49, 55, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942). Thus, Counts 1 and 2 need not be read as indivisible conspiracy counts embracing each and every alleged objective. Any one of the remaining three charged objectives would be sufficient, standing alone, to sustain the defendants' convictions and sentences. *Newman*, 817 F.2d at 638. We conclude, therefore, that the firearms ob-

---

vol. IV., at 35. The defendants' brief is in fact a motion to dismiss Counts 1 and 2 of the indictment as "duplicitous." *Id.* vol. I, doc. 25. (This is noteworthy because it is inconsistent with their position on appeal.) We do not, however, construe that motion as a motion to strike the offending language as surplusage, Fed.R.Crim.P. 7(d), and therefore we cannot hold that defendants have waived their improper amendment argument on appeal.

Ultimately, by minute order dated October 24, 1988, the court struck the § 924 firearms objective from Counts I and II as surplusage. Rec. vol. I, doc. 29.

**53.** This is not to say that the defendants cannot, as a factual matter, agree in a single conspiracy to commit more than one substantive offense. That is precisely why this indictment is not

duplicitous as originally drafted, for it charged but a single agreement, albeit one to violate both the narcotics laws and the firearms laws. *Cf. Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) (a conspiratorial agreement is but one offense, no matter how diverse the objectives).

**54.** Only two cases are seemingly to the contrary. *See United States v. Betancourt*, 838 F.2d 168, 176 (6th Cir.1988); *United States v. Quicksey*, 525 F.2d 337, 340 (4th Cir.1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). Both simply assumed without discussion that a single conspiracy under § 846 could embrace both a narcotics violation and a Travel Act violation (18 U.S.C. § 1952).

jective was "independent of" and "unnecessary to" the defendants' convictions on the § 846 conspiracy counts and therefore separable from the indictment. *See Miller*, 471 U.S. at 136, 105 S.Ct. at 1815; *Ford v. United States*, 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927).

Defendants rely on *United States v. Quicksey*, 525 F.2d 337 (4th Cir.1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). In *Quicksey*, the jury found the defendants guilty of a single conspiracy to violate both 18 U.S.C. § 1952 and 21 U.S.C. § 841(a)(1), without specifying whether they were guilty of a general conspiracy under 18 U.S.C. § 371 or a narcotics conspiracy under 21 U.S.C. § 846. The trial court had refused the defendants' motion to require the government to elect which statute it was relying on, and had instructed the jury that it could find guilt if it believed the defendants conspired to violate the Travel Act. *See* 525 F.2d at 340–41. The court held the resulting ambiguity fatal: "[I]n the absence of a special verdict, it is not possible to ascertain whether the jury intended to find the defendants guilty of conspriacy to violate the Travel Act or the Drug Act, or both Acts." *Id.* at 341. Here, by contrast, there was no possible ambiguity in the jury's verdict precisely because the trial court struck the extraneous language from the indictment and instructed the jury solely under 21 U.S.C. § 846. Thus, *Quicksey* is distinguishable.

▇ The trial court, of course, may not amend an indictment so as to add an offense or otherwise broaden the possible bases for conviction. *E.g., Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). The Fifth Amendment grand jury clause permits substantive amendment of an indictment only by resubmission to the grand jury. *Id.* at 215–16, 80 S.Ct. at 272; *see also Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). The court may, however, strike from an indictment allegations which are both independent of and unnecessary to the offense on which a conviction ultimately rests, provided nothing is thereby added to the indictment. *Miller*, 471 U.S. at 136–37, 105 S.Ct. at 1815; *Ford*, 273 U.S. at 602, 47 S.Ct. at 534; *Salinger v. United States*, 272 U.S. 542, 548–49, 47 S.Ct. 173, 174–175, 71 L.Ed. 398 (1926). This distinction is fundamental, of course, because "a conviction cannot stand if based on an offense that is different from that alleged in the grand jury's indictment." *Miller*, 471 U.S. at 142, 105 S.Ct. at 1818. In *Stirone*, for example, "the offense proved at trial was *not* fully contained in the indictment, for trial evidence had 'amended' the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment." *Miller*, 471 U.S. at 138, 105 S.Ct. at 1816 (emphasis in original).

Here, there is no doubt that by striking the firearms objective from Counts 1 and 2 of the indictment, the court cured any potential defect without adding any new offenses. *See Salinger*, 272 U.S. at 548–49, 47 S.Ct. at 175 (withdrawal from the jury's consideration of one or more methods of committing the charged offense did not impermissibly amend the indictment). The defendants' conspiracy convictions may stand on proof of any *one* of the alleged objectives, *Newman*, 817 F.2d at 638, and it follows that the withdrawal of one of those objectives from the jury's consideration narrowed the possible bases for conviction and correspondingly limited the scope of the evidence which could be used at trial.[55] Thus, defendants were tried on charges fully contained within the indictment; their Fifth Amendment guarantee to a trial only on charges returned by the grand jury was therefore adequately protected.

Moreover, the defendants do not assert, nor is there any showing, that they have suffered any actual prejudice. As we have already concluded, defendants' convictions under § 846 are based on proof which corresponds to an offense that was clearly and completely set out in the indictment. Defendants do not contend that they were

---

**55.** It is significant that it was precisely this benefit which motivated much of defense counsel's argument to the judge at trial. *E.g.,* X R. at 401 ("Your Honor, we have contended that the firearms should not have been a part of the evidence on Count 1 [or Count 2].... The only time it should have come up ... [is] in the specific counts of firearms.").

unable to prepare their defense or were in any way misled by the erroneous inclusion of the firearms objective in Counts 1 and 2. Indeed, the record discloses just the opposite. Defense counsel repeatedly stated that, based on the indictment and the prosecutor's representations at the arraignment, defense counsel believed that "there was nothing in Counts 1 and 2 but a drug conspiracy." IV R. at 12; *see also id.* at 13.[56] This understanding was clearly borne out at trial.

In sum, we hold that defendants were subject to being sentenced under § 846 as charged. The indictment in this case expressly charged conspiracies to violate 21 U.S.C. § 841(a)(1), a provision of the Controlled Substances Act. Section 846 of that Title provides that conspiracy to commit an offense defined in that Act is punishable to the same extent as the offense which is the object of the conspiracy. Thus, the indictment clearly put defendants on notice of the sentencing provisions applicable to 21 U.S.C. § 846. And, as we have already held, the narcotics conspiracies proved at trial were fully contained within the indictment. By contrast, there was no reference in the indictment to 18 U.S.C. § 371 and the defendants have never asserted that they understood the indictment to charge a violation of that section. *Cf. United States v. Kennington,* 650 F.2d 544, 546 (5th Cir. 1981). The defendants have suffered no prejudice as a result of the inclusion of the firearms objective in Counts 1 and 2, or by the trial court's deletion of those objectives from the indictment.

## XI.

### Conclusion

For the foregoing reasons, the convictions and sentences of all the defendants must be reversed and the cause is remanded for further proceedings in accord with this opinion.

IT IS SO ORDERED.

TACHA, Circuit Judge, dissenting.

I respectfully dissent from the majority on Part IX.C.2 regarding the sufficiency of the evidence to support the conviction of Mary Sullivan under Count 4 of the indictment, which charges "knowingly and unlawfully us[ing] or carr[ying] firearms during the commission of a felony" in violation of 18 U.S.C. § 924(c)(1). Evaluated in the light most favorable to the government, the evidence is sufficient to allow a reasonable jury to conclude Mary Sullivan is guilty beyond a reasonable doubt of violating section 924(c)(1).

In reviewing the sufficiency of the evidence on which the jury conviction rests, we must evaluate the evidence—both direct and circumstantial—in the light most favorable to the government. *United States v. Culpepper,* 834 F.2d 879, 881 (10th Cir. 1987); *United States v. Hooks,* 780 F.2d 1526, 1529 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). All reasonable inferences and credibility choices must be made in favor of the jury verdict. *United States v. Massey,* 687 F.2d 1348, 1354 (10th Cir.1982). The evidence need not exclude every reasonable hypothesis other than guilt; it simply must be sufficient for a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Culpepper,* 834 F.2d at 881.

Our legal standard for determining whether a criminal defendant "uses" a fire-

---

**56.** The following statements of counsel are particularly instructive. In response the the court's query why he had not brought the allegedly defective indictment to the court's attention earlier, defense counsel stated:

[A]s soon as evidence was offered on the ... gun violation in Count 1, we did approach the bench, we did object. I didn't see it, is about all I can tell you, pretrial. I just didn't see it. I didn't understand it. We felt like we were led by the Government, for the reasons I've cited above, to believe that Count 1 and Count

2 were only drug conspiracies. We feel like—I thought, if I saw it at all prior to trial, I thought it was surplusage or scribner's error. And I feel like ...—that our position does indicate that there is good cause for relief under Rule 12(f).

IV R. at 13. The ·reference to Rule 12(f) is interesting because it suggests that, if given the opportunity, defense counsel would have moved to strike the offending language, thereby obviating this problem entirely.

arm "during and in relation to" a drug trafficking offense is set forth in *United States v. McKinnell*, 888 F.2d 669, 675 (10th Cir.1989). There, we explained section 924(c)(1) is satisfied when: (1) the defendant has "ready access" to the firearm, and (2) the firearm "was an integral part of his criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed." *Id.* at 675 (quoting *United States v. Matra*, 841 F.2d 837, 843 (8th Cir.1988)).

In *McKinnell*, we discussed with approval the decisions of other circuits interpreting the "use" element of section 924(c)(1). 888 F.2d at 674. One of these cases, *United States v. Robinson*, 857 F.2d 1006 (5th Cir.1988), is almost identical to our present case. In *Robinson*, the officers found a total of seven firearms in Robinson's house. *Id.* at 1010. They even found one pistol hidden in a boot in the laundry room. *Id.* at 1007. In response to Robinson's claim he did not own these weapons, the court emphasized that "ownership is not essential to possession, which in certain circumstances can constitute use within the meaning of 924(c)(1)." *Id.* at 1010. The court held the evidence of the weapons found in the house was sufficient to sustain the conviction because a jury could reasonably conclude that Robinson's possession of firearms was an integral part of the felony and Robinson "used" at least one weapon as a means of safeguarding and facilitating the illegal transactions. *Id.*

In *United States v. Meggett*, 875 F.2d 24, 25 (2d Cir.), *cert. denied sub nom. United States v. Bradley*, — U.S. —, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989), another case we approved in *McKinnell*, the police found five firearms in various places throughout defendant Bradley's apartment. Bradley admitted the weapons were his, but he claimed they were part of a "gun collection." *Id.* at 26. In holding the evidence was sufficient, the circuit court noted a jury could reasonably conclude the weapons in the apartment were on hand to protect that apartment as a storage and processing point for the narcotics. *Id.* at 29. The court held the evidence was sufficient even though Bradley was not at home

when the police raid occurred. *Id.* at 25, 29. The court considered the jury's conclusion reasonable based on the evidence, holding it did not matter that the weapons were in Bradley's apartment and not at the scene of distribution where he was arrested. *Id.* at 29.

Finally, in *United States v. Matra*, 841 F.2d 837, 839 (8th Cir.1988), officers found eight weapons on both the first and second floors of the house where Matra was arrested. One submachine gun was stashed under a waterbed in the center upstairs bedroom, which was locked when the police arrived. *Id.* Although none of the weapons were in Matra's actual possession, the district court ruled the machine gun was present and available to Matra because he possessed a key to the center bedroom. *Id.* at 842–43. The district court also found the weapons were kept ready to protect a drug house, thereby safeguarding and facilitating the illegal operation. *Id.* at 842. The circuit court upheld the factual findings of the district court, holding the evidence in the record was sufficient to support the district court's determination that Matra "used" the machine gun as section 924(c)(1) requires. *Id.* at 843. The court noted that "[i]n these circumstances, it would defy both logic and common sense to conclude that Matra did not 'use' the machine gun within the meaning of § 924(c)." *Id.*

There are numerous other cases we did not include in our opinion in *McKinnell* that convince me it would "defy both logic and common sense" to conclude Mary Sullivan did not "use" at least one of the many firearms found in her house. For example, in *United States v. LaGuardia*, 774 F.2d 317, 318 (8th Cir.1985), the officers found two pistols in LaGuardia's house and one in the trunk of his car parked outside. Noting that "[w]eapons can be used for protection or intimidation and therefore facilitation of illegal transactions," the court held this evidence was sufficient for a reasonable jury to convict the defendant. *Id.* at 321 (citing *United States v. Mason*, 658 F.2d 1263, 1271 (9th Cir.1981)). As the court explained, the weapons had "un-

doubted utility in protection of the valuable supply [of cocaine] on hand." *LaGuardia*, 774 F.2d at 321. Further, it stated the "presence and availability in light of the evident need demonstrates the use of the firearm to commit the felony." *Id.*

Another recent example of a case in which the evidence of firearms was sufficient to satisfy the "use" element of section 924(c)(1) is *United States v. Boyd*, 885 F.2d 246, 249 (5th Cir.1989). In *Boyd* the court held the evidence of a shotgun in a warehouse office was sufficient for a reasonable jury to conclude section 924(c)(1) was satisfied even though the gun was broken open and could not be used until it was closed. *Id.* at 250. The court in *Boyd* noted, "[i]t is enough that the firearm was present at the drug-trafficking scene, that the weapon could have been used to protect or facilitate the operation, and that the presence of the weapon was in some way connected with the drug-trafficking." *Id.* (citing *Robinson*, 857 F.2d at 375). Similarly, in *United States v. Alvarado*, 882 F.2d 645, 654 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990), the court held three guns found in various locations in Alvarado's apartment were sufficient evidence for a reasonable jury to convict her of three counts of violating section 924(c)(1). The court also found the discovery of two other guns was "ample" evidence to uphold two further counts even though those two guns were locked in a safe in a walk-in closet. *Id.*

Turning to the evidence of firearms discovered in the present case, the record shows Mary Sullivan "used" a firearm within the meaning of section 924(c)(1). *McKinnell* first requires the defendant have "ready access" to a firearm. 888 F.2d at 675. I am convinced there is sufficient evidence for a reasonable jury to conclude Mary Sullivan had ready access to a firearm. At trial Steve Howell testified he took his mother's gun from his father's Blazer, carried it into Mary Sullivan's house, and left it there. XI at 600–01. Mary Sullivan herself testified that Howell gave this gun to her son, Steve Brown. XVII at 2086. She also testified her son

placed this gun on her piano. *Id.* Howell testified an AR–15 with a sears clip attached was sitting on the kitchen table in Mary Sullivan's house on Monday night, the night before she was arrested. XI at 601–03; XVII at 2087. Mary Sullivan testified the arresting officers entered while she was shelling peas in the kitchen, and they confiscated all the weapons in the house. *Id.* at 2088. With a gun sitting on her piano, another on the kitchen table, and all the other firearms in the house, Mary Sullivan clearly had ready access to a firearm. Her ready access to a firearm is even more certain when the position of these weapons in relation to Mary is compared with the situations discussed above.

*McKinnell* also requires the evidence be sufficient for a jury to reasonably conclude the firearm was an "integral part" of the criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed. 888 F.2d at 675. I am convinced of the reasonableness of the jury's determination that the use of firearms contributed to the drug trafficking operation. Mary Sullivan knew the guns were present in the house. XVII at 2088. She also was home when Russell Sullivan demonstrated how the sears clip fit on the AR–15. *Id.* at 2086–88; XI at 601–03. The weapons could have been used for protection or intimidation, thereby facilitating the drug conspiracy operating from her house. The weapons had undoubted utility in safeguarding the operation. I cannot conclude there was insufficient evidence of a connection between the firearms and the drug offenses. Based on the testimony of Steve Howell and Mary Sullivan, I would hold the evidence of "use" of the firearms was sufficient to sustain Mary Sullivan's conviction under section 924(c)(1).

In my view, Mary Sullivan's statement that all the guns the officers found in her house were part of a "gun collection" belonging to her son James Wesley is immaterial to our review. I fail to understand why her claim that these firearms belong to her son—if at all true—is relevant to determining the reasonableness of a finding she "used" the guns. The test for "use" in *McKinnell* is an inquiry about

availability, not ownership, of firearms. *See Robinson*, 857 F.2d at 1010. The evidence supporting a *possession* of firearms charge may include a showing of indicia of ownership. A charge of *using* firearms, however, is fact-specific. It requires an inquiry into facts about the availability of the guns and their possible use for protection and intimidation. Ready access is clearly a factual determination, not a legal standard. We merely review the record to determine whether there is some evidence to support factual determinations already made by the jury.

The jury apparently rejected the credibility of Mary Sullivan's testimony on the gun collection point by convicting her of one count of firearm "use" under section 924(c)(1). *See Meggett*, 875 F.2d at 26, 29. Rather than reevaluating the credibility of Mary Sullivan's testimony, we must consider the evidence in the light most favorable to the verdict and resolve all credibility choices in the government's favor. Applying this standard of review, I would hold the evidence is sufficient for a jury to conclude beyond a reasonable doubt that Mary Sullivan "used" a firearm within the meaning of section 924(c)(1).