51 F.3d 287
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dora Lea GUNDERMAN, Defendant-Appellant.
 No. 94-1124.
 United States Court of Appeals, Tenth Circuit.
 March 28, 1995.
 
 1
 Before Anderson and Kelly, Circuit Judges, and Cook,* Senior District Judge.
 
 
 2
 ORDER AND JUDGMENT**
 
 
 3
 COOK, Senior District Judge, Sitting by Designation.
 
 
 4
 Dora Lea Gunderman appealed the trial court's denial of her motion for suppression of evidence seized from her apartment under Federal and State warrants, which she contended were tainted by earlier warrantless entries by police officials and were overbroad. She also appealed her sentence arguing that the trial judge did not realize that he had discretion to depart downward from the guidelines if he believed her assigned criminal history category over-represented the seriousness of her criminal history. We affirm.
 
 
 5
 A detailed statement of the factual background of this case can be found in our Order and Judgment in the appeal of Gunderman's co-defendant at trial, United States v. Cataldo, No. 94-1122, 1995 WL 66443 (10th Cir. Feb. 7, 1995). Additional facts necessary to resolve the additional issues raised in Gunderman's appeal appear in our discussion of the issues below.
 
 I.
 
 6
 We hold that the warrantless police entries into Gunderman's apartment were reasonable and the warrants were not tainted for the reasons stated in the related appeal of her co-defendant at trial in United States v. Cataldo, No. 94-1122, 1995 WL 66443 (10th Cir. Feb. 7, 1995).
 
 II.
 
 7
 Appellant also argued that the warrants were overbroad. She argued that the warrants "refer to general crimes which may or may not have been committed with the alleged chemicals and items set forth in the applications for search warrant and the search warrants themselves." Gunderman further argued that the Federal warrant was defective because it provided for seizing items associated with "marijuana smuggling and distribution", even though there was no evidence in the warrant application of marijuana smuggling or distribution. The government admits that the mention of marijuana smuggling was "an administrative error in an attachment routinely utilized in drug warrants."
 
 
 8
 The State warrants were obtained shortly after two warrantless police entries following an explosion that caused a fire. Investigator Callister, along with fire officials made the second such entry and examined the bathroom in the apartment where the explosion had occurred.
 
 
 9
 Callister then proceeded to seek search warrants and executed the affidavits with attachments that accompanied applications for warrants to search the apartment and an automobile suspected of being used by Cataldo and Gunderman. In these documents Callister stated that most of the apartment's interior had been damaged by fire and smoke, that the fire damage was more concentrated in the bathroom, that he saw a can of acetone in the living room of the apartment and that he smelled the odor of acetone in the Gunderman apartment. He also stated that when he examined the bathroom of the Gunderman apartment he saw that the sink contained "what appeared to be stoppered glass pop bottles" with tubing running from the pop bottles to the toilet, which "was in pieces as if an explosion had occurred" there. The affidavit further states that a hot plate was on the counter and several acetone cans were in the bathtub.
 
 
 10
 Callister also related what he had been told by Officer Walton, who had made a prior warrantless entry under the exigent circumstances following the explosion: Walton said he had seen several cans of acetone, a small battery charger by the back door attached to a cooler and a small fire safe sitting in plain view on the floor. Walton said that although he had been told by Cataldo that the accident occurred while the occupants were painting he saw no brushes, rollers or other items that might be used for painting in the bathroom.
 
 
 11
 Callister stated in the affidavit that in his opinion the apartment was being used as a "clandestine laboratory manufacturing illicit narcotics." He went on to say that acetone is commonly used in such laboratories and that people involved in the use, sale, possession or manufacturing of illicit narcotics commonly have drug paraphernalia, currency and documents showing the identity of other people involved in illegal narcotics in their homes or vehicles.
 
 
 12
 The search pursuant to the State warrants was conducted on October 30, 1993. An affidavit supporting the application for the Federal warrant was executed on November 15, 1993 by Kyle W. Bowen, a special agent of the Drug Enforcement Administration (DEA), with four years experience in the DEA and twelve years prior experience as a police officer in American Fork, Utah. This affidavit related background facts from Callister's affidavit regarding what Walton and Callister saw at the apartment during their warrantless entries. It also states that based upon his experience Bowen knew that: "After purchasing ... drugs ... drug traffickers will transport, or cause to be transported the ... drugs ... The methods of transportation include, but are not limited to, commercial airlines, private airplanes, rental automobiles, private automobiles, and government and contract mail carriers." R.Vol. 1, attachments to Item 5. In addition the Bowen affidavit related that during the initial search pursuant to the State warrants agents had identified and seized acetone, toluene, hydrochloric acid and sodium dichromate which he stated "are used in a methcathinone laboratory." He further states that the two individuals injured in the explosion were William Cataldo and Dora Gunderman and that Callister advised him that Cataldo showed previous contacts by law enforcement officials for possession of methcathinone. Bowen said that approximately thirty telephone books could be observed in photographs of the apartment and that he suspected that William Cataldo was operating a multi-state operation of clandestine laboratories.
 
 
 13
 In reviewing a suppression order the court reviews only for clearly erroneous factual findings, while reviewing determinations of law de novo. United States v. Soussi, 29 F.3d 565, 568 (10th Cir.1994). In United States v. Harris, 903 F.2d 770, 774-775 (10th Cir.1990) we said:
 
 
 14
 "The issue of whether a warrant is overbroad is a legal question subject to de novo review on appeal. United States v. Leary, 846 F.2d, 600 (10th Cir.1988). The fourth amendment requires that warrants 'particularly describ[e] the place to be searched, and the persons or things to be seized.' U.S. Const. amend. IV. A search warrant must be sufficiently particular in describing the things to be seized to prevent a 'general, exploratory rummaging in a persons's belongings.' Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The description is sufficiently particular when it 'enables the searcher to reasonably ascertain and identify the things authorized to be seized.' Leary, 846 F.2d at 600 (quoting United States v. Wolfenbarger, 696 F.2d 750, 752 (10th Cir.1982). A warrant that describes items to be seized in broad and generic terms may be valid if the description is as specific as circumstances and nature of the activity under investigation permit."
 
 
 15
 Id., at 774-775 (alteration in original).
 
 
 16
 Although some provisions of the Federal warrant admittedly used language that was not tailored to the facts of this particular case an examination of "Attachment B" to the Federal warrant and the inventory of items seized indicates that all items seized could have been seized under paragraphs other than those numbered 2 (the paragraph related to marijuana smuggling), 5 (including devices relating to aeronautical and marine navigation) and 7 (including items related to computer and electronic storage with no qualifying language relating to whether they were used for criminal purposes). We need not and do not decide whether these three paragraphs were overbroad in this particular case nor whether their inclusion, if accidental, would have been an excusable good faith error because we find that these provisions may be severed from the warrant under United States v. Brown, 984 F.2d 1074 (10th Cir.), cert. denied, 114 S.Ct. 204 (1993).[1]
 
 
 17
 In United States v. Naugle, 997 F.2d 819, 822 (10th Cir.), cert. denied, 114 S.Ct. 562 (1993) we held that to "make the severability doctrine applicable the valid portions of the warrant must be sufficiently particularized, distinguishable from the invalid portions, and make up the greater part of the warrant." In this case the remaining portions of the warrant are distinguishable in that they are separately numbered and each paragraph is directed at different kinds of items even if there is some possible overlap of the provisions. Further, the remaining portions of the warrant make up the greater part of the warrant both in terms of the number of paragraphs remaining and the number of items seized. In fact, all of the items seized could have been seized under the warrant as severed.
 
 
 18
 We also hold that the remaining portions of the warrant are sufficiently particularized. The remaining provisions of the warrant generically describe items relating to domestic and international travel, photographic evidence of the suspects and controlled substances, business records, items associated with processing controlled substances and preserialized government funds used for the controlled purchase of narcotics.[2]
 
 
 19
 The first paragraph on items relating to domestic and international travel does not contain any language relating to criminal misconduct associated with the travel, but such a qualification would have been pointless unless the agents searching the premises already knew the locations and times the defendants would have been engaged in drug related transactions or could otherwise have made the necessary distinction between legal and illegal travel.
 
 
 20
 In our judgment, the other remaining provisions fall within the scope of our previous decisions in drug related cases. As we noted in United States v. Wicks, 995 F.2d 964, 973 (10th Cir.), cert. denied, 114 S.Ct. 482 (1993): "We have upheld search warrants cast in comparably broad terms, where the subject of the search was a drug trafficking or drug dealing business, and where circumstances permitted only a more general listing of the items to be seized."
 
 
 21
 The challenged State warrants also generally use the kind of generic language found permissible in our prior holdings, such as United States v. Wicks, 995 F.2d at 973-974, and the cases cited therein, with only two possible exceptions, which we will here discuss in more detail.[3]
 
 
 22
 Where generic language describing broad categories of items that may be seized has been upheld in cases such as this there is typically a listing in the warrant of examples of items that might be seized. See, e.g. United States v. Sullivan, 919 F.2d 1403, 1424, n. 31 (1990). In the case before us two items were not treated in this way. The warrant provides for a search for "materials used in the use, sale, possession, and manufacturing of illicit narcotics" and "drug paraphernalia as defined by C.R.S. 18-18-426". R.Vol. 1, attachments to Item 5. Because these two items are so similar conceptually and largely overlap in their coverage we will consider them together.
 
 
 23
 The paraphernalia statute citation correctly references the provision of the Criminal Code of the State of Colorado on drug paraphernalia, which contains a detailed listing of examples of items that might be considered drug paraphernalia much like the listings contained in the warrants before us in United States v. Sullivan, supra, only more detailed. The facts here are even more similar to those in the case of United States v. Janus Industries, --- F.3d ----, Nos. 94-1074, 94-1075, 94-1113, 94-1114, 1995 WL 82673 (10th Cir. Jan. 18, 1995) heard before this panel the same day as Gunderman's appeal. There we held that the citation and attachment of the language of the Federal drug paraphernalia statutory definition (21 U.S.C. Sec. 863(d)) to a warrant was sufficiently particular because of the detailed list of examples in the Federal statute and the fact that the "catchall" language of the statute was sufficiently limited by the definitional requirement that such items be "primarily intended for use" or "designed for use" as paraphernalia. The Colorado statute in this case has an even more detailed listing of examples than its Federal counterpart. The Colorado statute, like the Federal statute, contains a "catchall" provision, "all ... materials of any kind which are used, intended for use, or designed for use in ... producing, processing ... or ... introducing into the human body a controlled substance in violation of the laws of this state." However, as in Janus, this catchall is adequately limited by the statutory language--in this case the similar wording "used, intended for use, or designed for use." 8B COLO.REV.STAT. Sec. 18-18-426 (Supp.1994). Our analysis of the catchall provision of the referenced paraphernalia statute also applies to the preceding language from the warrant, which is sufficiently limited by the phrase "materials used in" the use, manufacture, etc. of illicit narcotics.
 
 
 24
 We are aware of our holding in United States v. Leary, 846 F.2d 592, 602 (10th Cir.1988) that limiting a search only to records that violate a certain statute is generally not enough. However, the Leary case is distinguishable in that Leary involved a warrant that permitted a search for any document showing a violation of a general Federal statute and it permitted a search in scope far beyond that for which probable cause had been shown. See, United States v. Wicks, 995 F.2d at 974, n. 6. Even in Leary we noted that "some federal statutes may be narrow enough to meet the fourth amendment's requirement" when cited in a warrant to define items to be seized. Leary, at 601.
 
 
 25
 In this case the statute was sufficiently narrow and there was probable cause to believe that Gunderman had violated laws related to drug trafficking; the State warrants (and the Federal warrant, as severed) were directed to the seizure of items related to that.[4] Accordingly, we hold that the State warrants and the Federal warrant, as severed, were neither overbroad with respect to the demonstrated probable cause, nor lacking in particularity.
 
 III.
 
 26
 Finally, Appellant argued that the trial judge misunderstood the law and believed he had no discretion to depart downward from the guidelines.
 
 
 27
 As judges have become more familiar with their discretion to depart from the sentencing guidelines we have become less inclined to presume that a trial judge might misunderstand the law. Our current rule for decision of cases such as this was stated in United States v. Rodriguez, 30 F.3d 1318 (10th Cir.1994). In that case we said:
 
 
 28
 "... unless the judge's language unambiguously states that the judge does not believe he has authority to downward depart, we will not review his decision. Absent such a misunderstanding on the sentencing judge's part, illegality, or an incorrect application of the guidelines, we will not review the denial of a downward departure."
 
 Id., at 1319. (emphasis added)
 
 29
 Appellant's argument that the trial judge must not have understood the law is based on a statement made by the judge in the sentencing hearing, as follows: "I feel an obligation to treat you under the law, and it's my job. I can't do otherwise." From this statement Appellant concluded that the trial judge failed to consider the arguments for a downward departure.
 
 
 30
 To assess the strength of the Appellant's argument it is useful to view the cited statement in context. Judge Carrigan (speaking to the defendant) said:
 
 
 31
 "Well, you are apparently kind of a free spirit in terms of your love of the outdoors and nature. I can relate to that having spent six summers in the forest service myself, all kinds of settings, fighting fires, and sitting on lookout towers, to cutting trails, to pruning trees but--and probably the best time I ever spent in my life--so I can understand that. I don't think you need to be a conformist in the life-style sense, but I hope you are going to learn one of these days that you have to conform to the law, because pretty soon the sentences get awful long, and it just isn't worth it. I feel an obligation to treat you under the law, and it's my job. I can't do otherwise. But I hope that this will be the last time you will be back in Court."
 
 
 32
 R.Vol. 3 at 8.
 
 
 33
 Viewing these remarks as a whole, it appears that the trial judge was merely making some introductory remarks to Gunderman to make clear that he was not mandating that she adopt a conventional life-style but merely that she conform to the law, which was his duty. The specific issue of the length of the sentence is discussed in the next paragraph of the transcript:
 
 
 34
 "The Court finds that the total offense level is 17, and the defendant's criminal history category is 1 numeral II, which results in an imprisonment range of 27 to 33 months, a supervised release range as to Count One of three to five years and as to Count Three, two to three years, and a fine range of $5,000 to $1 million. The Court finds no reason to depart from the guideline range which does not exceed 24 months and will impose a sentence within that range."
 
 R.Vol. 3 at 8. (emphasis added)
 
 35
 At oral argument Gunderman said the judge was merely stating that he saw no reason to depart upward and that he never acknowledged his ability to depart downward. It is hard to imagine that the judge would have been aware of the possibility of departing upward but not downward. Before sentencing Appellant had presented to the judge arguments in favor of a downward departure.[5]
 
 
 36
 We hold that the quoted passage does not unambiguously demonstrate that the trial judge believed he had no authority to depart downward. The guideline provision under which Gunderman sought a downward departure gave as an example for downward departure a case where there were two minor misdemeanors approximately ten years old. U.S.S.G. Sec. 4A1.3. Gunderman had two prior misdemeanors but they were not close to ten years old; the judge may have concluded that under the guidelines a downward departure was not appropriate under the facts of this case because of the recency of her prior offenses. The judge's comments are entirely consistent with this very plausible hypothesis.
 
 
 37
 From all of the facts, and reading the judge's comments in context, it appears most likely that the judge was merely attempting to inform Gunderman of the sentence he deemed to be appropriate in her particular case under the law and guidelines, and that he intended to inform her of his decision in as civil a manner as possible and to make clear that he was not doing so for reasons of personal animosity.
 
 
 38
 Accordingly we hold that the warrants were not tainted or overbroad and that Appellant has not shown error by the trial judge in sentencing; the judgment of the District Court is, therefore,
 
 
 39
 AFFIRMED.
 
 
 
 *
 The Honorable H. Dale Cook, Senior District Judge, United States District Court for the Northern, Eastern and Western Districts of Oklahoma, sitting by designation
 
 
 **
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 Although severance was not argued below, this court may, in its discretion, consider a point not so raised to affirm the judgment below where the point is purely one of law and where the point is a ground for affirming the judgment below. Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 721 (10th Cir.1993). In this case the criteria for severance not in issue below are legal issues that can be resolved solely on the basis of the warrants and their applications with supporting papers, all of which are included in the record
 
 
 [2]
 The precise language of "Attachment B" to the Federal warrant follows:
 "1. Tickets, itinerary, receipts, reservation confirmation, maps, nautical and aeronautical charts, and other items relating to domestic and international travel.
 
 
 [2]
 The following items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money derived from marijuana smuggling and distribution: books, records, invoices, receipts, records of real estate or securities transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, work papers, escrow files, wire transfer records;
 
 
 [3]
 Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled dangerous substances;
 
 
 [4]
 Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;
 
 
 [5]
 Devices used in the aid of aeronautical and marine navigation, such as LORAN, global satellite positioning, and other location-finding equipment;
 
 
 [6]
 Items associated with the processing of controlled substances for transportation and distribution, such as pay-and-owe sheets, accounting, ledgers, measuring instruments and scales, compression devices, glassine or plastic bags and packaging material;
 
 
 [7]
 Items associated with electronic and computer-aided storage and transmission, including computers, discs, facsimiles, modems, cassette tapes, compact discs, electronic calendars, address/phone storage items
 
 
 [8]
 Pre-serialized government funds used for the controlled purchase of narcotics."
 R.Vol. 1, attachments to Item 5.
 
 
 [3]
 Both State warrants used the same description of items to be searched for, as follows:
 "Documents showing the identity of the person(s) living in, occupying, using, or renting the apartment at 410 Tucker Street apartment # 1; documents showing the source or purchase of acetone and other unknown precursor chemicals; documents showing the use, sale, possession, or manufacturing of illicit narcotics; documents showing the identity, source, or location of any other people or associates of the person(s) involved in the use, sale, possession, or manufacturing of illicit narcotics; materials used in the use, sale, possession, and manufacturing of illicit narcotics; acetone; drug paraphernalia as defined by C.R.S. 18-18-426; currency; small fire safe."
 R.Vol. 1, attachments to Item 5.
 
 
 [4]
 The case of Voss v. Bergsgaard, 774 F.2d 402 (10th Cir.1985), cited by Gunderman, is also inapposite. Voss, like Leary, involved another broad search exceeding the demonstrated probable cause; and is further distinguishable in that the warrant language permitted a search for books possessed by an organization that espoused dissident views. The court noted that the lack of particularity of the warrant in that case even permitted the seizure of a copy of The Federalist Papers. We note that "[t]he Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." Marcus v. Search Warrant, 367 U.S. 717, 729 (1961). The searches in this case do not implicate the rights to freedom of expression and association in the manner of the search before this court in Voss
 
 
 [5]
 The addendum to the presentence report said that Gunderman had requested downward departure and cited U.S.S.G. Sec. 4A1.3. In addition, Appellant's counsel made further arguments in favor of a downward departure just prior to sentencing